1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9  | MS Amlin Marine N.V. t/a Lead Yacht MS
10 | Amlin Marine N.V. t/a Lead Yacht acting on
   | behalf of MS Amlin Insurance SE; Syndicate
   | 0457; Syndicate 1969; Syndicate 2791;
11 | Syndicate 5000; and Convex Insurance U.K.
   | Ltd., Underwriters at Lloyd's, London
12 | Subscribing to Policy B1098M203407 ,

13                          Plaintiffs,

14        v.

15 | Delta Marine Industries, Inc., a Washington
   | corporation; Marine Travelift, Inc., a
16 | Wisconsin corporation; Kendrick Equipment
   | (USA) LLC, a Washington corporation, and
17 | Kendrick Equipment, Ltd., a Canadian
   | corporation, Arxcis, Inc., a Washington
18 | corporation,

19                          Defendant.

20

Case No.  2:23-cv-00014

**IN ADMIRALTY**

**COMPLAINT FOR DAMAGES**

21        PLAINTIFFS, MS Amlin Marine N.V. t/a Lead Yacht, acting on behalf of MS Amlin

22 Insurance SE; Syndicate 0457; Syndicate 1969; Syndicate 2791; Syndicate 5000; Convex

23 Insurance U.K. Ltd., Underwriters at Lloyd's, London subscribing to marine insurance Hull and

24 Machinery Policy B1098M203407 (collectively "Plaintiffs" or "MS Amlin"), and allege as

25 follows:

26                          **THE PARTIES**

27        27.    Plaintiffs are Underwriters and Syndicates conducting the business of marine

COMPLAINT FOR DAMAGES - 1

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

insurance at Lloyd's, London, and subscribed to Hull and Machinery Policy B1098M203407 insuring Tropic Marine Ventures, Ltd., and/or David Ritchie (collectively "Tropic"), and the pleasure yacht TRITON ("TRITON" or the "yacht").

28.     Defendant Delta Marine Industries, Inc. ("Delta") is a Washington State for profit corporation with its principal place of business located at 1608 South 96th Street, Seattle, WA 98108-5115. Delta operates a luxury yacht shipbuilding and repair facility in Seattle, Washington.

29.     Defendant Marine Travelift, Inc. ("MTI") is a for profit Wisconsin corporation with its principal place of business located at 49 E. Yew Street, Sturgeon Bay, WI 54235-197.  MTI is a manufacturer and seller of vessel lifts.

30.     Defendant Kendrick Equipment Ltd. is a for profit British Columbia corporation, Business Number 879548220, with its registered office at #158-2633 Viking Way, City of Richmond, British Columbia, V6V 3B6.

31.     Defendant Kendrick Equipment Ltd. has a Washington subsidiary, Kendrick Equipment (USA), LLC which is a Washington State for profit corporation with its principal place of business located at UNIT B - 19214, 94TH AVE, SURREY, BC, V4N 4E3, CANADA (collectively, "Kendrick"). Kendrick Equipment (USA), LLC maintains an office at 1609 Central Ave S, Unit #2, Kent, WA 98032. Kendrick represents equipment lines, including Marine Travelift, in the State of Washington. Kendrick purchased equipment parts and installed them on Delta's equipment and performed maintenance and repairs of Delta's Marine Travelift equipment.

32.     Defendant Arxcis, Inc. ("Arxcis") is a Washington State for profit corporation with its principal place of business located at 26292 Lindvog RD NE #110, Kingston, WA, 98346. Arxcis provides inspection and load test services for Marine Travelifts, including Delta's Marine Travelift equipment.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction of this case in Admiralty pursuant to 28 U.S.C. §1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

8.     Venue is proper in the Western District of Washington because this cause of action

COMPLAINT FOR DAMAGES - 2

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

1  arises out of events that occurred in Seattle, Washington, which is within the judicial district of the

2  United States District Court for the Western District of Washington.

### STATEMENT OF FACTS

**Tropic Brought TRITON to Delta Shipyard for Maintenance and Repairs.**

9.      In October 2019 and at all times relevant hereto, Tropic was the owner of the pleasure yacht TRITON, IMO Number 9093799, which is registered in the Republic of Marshall Islands, No. 70070.

10.      Tropic's address at all times relevant hereto was 2250 Bellevue Avenue, British Columbia, Canada.

11.      The TRITON was constructed at Delta Marine located in Seattle, Washington in 2004. The TRITON is 41.73 meters in length, 9.33 meters in breadth, and has a depth of 4.72 meters. The TRITON's lightship weight—that is the weight of the vessel without cargo, fuel, lubricating oil, ballast water, freshwater and feedwater in tanks, consumable stores, passengers and crew and their belongings, and any other effects—was 444.45 long tons, or 451.58 metric tons after construction.  The TRITON's hull was constructed of fiberglass and it was equipped with two 1,000 horsepower Caterpillar engines and was staffed by a maximum of 10 crewmembers.

12.      At all relevant times herein, Delta was the owner of a Marine Travelift Model 400C mobile boat hoist, manufactured by MTI in 2004.  Delta named the Travelift "Big Bob."  Big Bob had a 400 Metric Ton capacity to lift vessels as specified by the manufacturer, MTI. The manufacturer's serial number is 3043-103.

13.      Big Bob employs up to four slings to lift and transport boats throughout Delta's facilities. Woven metal cables support each sling and run the height of the Travelift to a fulcrum at the lift's peak. The cables then travel down from the lift's peak into one of eight metal housings that contain a series of gears and a spool in order to wind and unwind the cables during lifting and lowering. The housings are labeled L1-4 and R1-4 depending on the side of the lift and sequence of the housing.

14.      On information and belief, Kendrick maintained and inspected Big Bob at the

COMPLAINT FOR DAMAGES - 3

request of and on behalf of Delta.

15.     On information and belief, Arxcis inspected Big Bob at the request of and on behalf of Delta and/or Kendrick.

16.     On or about October 2, 2019, Tropic and Delta executed a Repair Yard Order ("Delta Contract") for the maintenance, updating, and repairs of the TRITON.

17.     The Delta Contract was on a printed form supplied by Delta, and the terms and conditions of the Delta Contract were not negotiated.

18.     The Delta Contract provided in Section 1. STATEMENT OF WORK- that Delta would perform the work on the TRITON "in accordance with Owner's instructions and good marine practice[.]"

19.     The Delta Contract contained a Limited Warranty and Exclusive Remedy in Section 5 of the Delta Contract, which provided as follows:

> **LIMITED WARRANTY AND EXCLUSIVE REMEDY – (A)**
> Yard warrants to Owner (but not to third parties) that all repairs and work performed hereunder will be free from defects in material and workmanship and conform to applicable express specifications for six (6) months from the date work under this Contract is completed; (B) Yard's warranty with respect to all Owner-furnished equipment installed aboard the Vessel by Yard shall be strictly limited to workmanlike installation in accordance with good marine practice; (C) Yard's warranty is limited to its application of paints and fairing materials and does not extend to prior or existing finishes, latent defects or original construction details or flaws. Yard shall purchase an apply paints and fairing materials of good marine quality and shall obtain and assign to Owner warranties for such products, Owners' redress for failure thereof shall be from manufacturer; (D) Yard makes no warranty of any kind, express or implied (including but not limited to warranties of fitness for particular purpose and warranties of merchantability), with respect to any machinery, equipment, or parts not manufactured by Yard. All such machinery, equipment and parts shall be covered only by the warranties, if any, of the manufacturer. Upon request, Yard will furnish to Owner copies of warranties provided by vendors and third-party suppliers of machinery, equipment and parts. Yard will use its reasonable efforts to provide that all warranties of such manufacturers or suppliers shall be for the benefit of the Owner and subject to direction action by the Owner.
>
> Yard's ability, and Owner's exclusive remedy for breach of any warranty for negligence, strict liability, or otherwise (regardless of legal theory) is limited solely, at the Yard's sole discretion and designated place of business where practicable, to the replacement,

COMPLAINT FOR DAMAGES - 4

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

repair, or adjustment of the alleged negligent installation as the case may be, where the work is proven to be other than as warranted. Owner shall be responsible for redelivery of the Vessel to such repair location.  This remedy is conditioned upon the presentation of satisfactory evidence indicating that such machinery, equipment, or part has been maintained and operated under normal conditions with competent supervision and within load, stress and other capacities applicable thereto.

20.     The Delta Contract contained a Limitation of Warranties and Damages, known as

a Red Letter Clause (hereafter "Exculpatory Provision") which provided as follows:

**6.        LIMITATION OF WARRANTIES AND DAMAGES –** (A) YARD MAKES NO WARRANTY OF ANY KIND, STATUTORY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, WORKMANLIKE PERFORMANCE, USAGE OR TRADE OR ANY OTHER WARRANTY, EXCEPT FOR THAT LIMITED WARRANTY PROVIDED IN PARAGRAPH 5 HEREOF WHICH IS EXTENDED ONLY TO THE OWNER AND SHALL EXPIRE AND TERMINATE SIX (6) MONTHS FROM COMPLETION OF WORK. (B) YARD SHALL NOT BE LIABLE UNDER ANY CIRCUMSTANCES (INCLUDED, BUT NOT LIMITED TO, ANY CLAIM FOR BREACH OF ANY WARRANTY, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE) FOR ANY CONSEQUENTIAL, SPECIAL, CONTINGENT, COMPENSATORY OR INCIDENTAL DAMAGES ARISING OUT OF, CONNECTED WITH, OR RESULTING FROM THIS CONTRACT OR THE USE OR OPERATION OF ANY ITEM COVERED OR PURCHASED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, ANY LIABILITY FOR LOSS OF CLAIMS OF THIRD PARTIES. (C) Yard shall identify and defend Owner against any and all claims for payment for services submitted by subcontractors or vendors of Yard arising under this Contract. Owner shall indemnify and hold harmless Yard, its employees and agents from any claim, charge, liability or damage or bodily injury, occupational sickness or disease or death of any person, including without limitation any employee or agent of Owner or subcontractor of Owner, for any physical damage to property or loss thereof which arises out of performance or malperformance of this Contract and is caused by Owner, including its subcontractors and its and their employees, agents, suppliers, in whole or in part or jointly with Yard, unless proximately caused solely by the negligence or willful misconduct of the Yard.  Upon writing request of the Owner, Owner shall at its own expense, defend any suit, action or other proceeding asserting a claim covered by this indemnity provision.  (D) IN NO EVENT SHALL YARD'S AGGREGATE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THE WORK DONE UNDER THIS CONTRACT TO ALL PARTIES IN INTEREST EXCEED IN THE AGGREGATE THE SUM OF $300,000 OR THE SUM RECEIVED BY THE YARD UNDER THIS REPAIR CONTRACT, WHICHEVER IS LESS.

COMPLAINT FOR DAMAGES - 5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

Specifically, Delta attempted to limit its liability to Tropic under the Exculpatory Provision of the Delta Contract.

21.    The Delta Contract contained a choice of law provision providing that the federal general maritime law of the United States applied to the construction and interpretation of the Delta Contract. The Delta Contract provided for an award of attorneys' fees to the prevailing party in the event that litigation occurs arising out of the Delta Contract and work performed by Delta in Section 11:

> **11.    APPLICABLE LAW**—These terms, conditions and covenants shall be governed by and construed in accordance with the general maritime law of the United States, insofar as applicable, and otherwise by the laws of the State of Washington.  The Yard expressly reserves all rights, liens and remedies granted by law including the right to enforce a lien against the Vessel. If a provision hereof is declared to be void, such provision shall be deemed severed from this document which shall otherwise remain in full force and effect.  If any legal action is brought arising from this Contract, the prevailing party shall be entitled to reasonable attorneys' fees plus costs.

22.    Tropic and Delta agreed that Delta would tent and drydock the TRITON at the Delta facility in Seattle for maintenance, updating, and repairs. The planned work included, but was not limited to, general maintenance and servicing of all systems, repainting the fiberglass hull, refurbishing the engines, installation of new generators, updating the air conditioning system and bringing all other systems up to current standards.

23.    Delta's engineers, designers, and naval architect created a protocol for planned welding and other "hot work" to be performed at the Delta facility on the TRITON. Delta was to conduct sea trials of the TRITON to ensure the adequacy of its updates and repairs.

24.    At all relevant times, Delta represented that its employees had the skill and expertise to perform the work on the TRITON, and to operate the equipment used for the refurbishment.

25.    On information and belief, Delta further represented that it had the necessary and appropriate equipment to safely perform the work on the TRITON, including the sea trials, in accord with reasonable shipbuilding standards throughout the process of refurbishment of the vessel.

COMPLAINT FOR DAMAGES - 6

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

26.     On or about October 13, 2020, the TRITON was placed in the South Finish Shed at the Delta facility, where the vessel remained on blocks and in dry dock throughout the maintenance period.

### Plaintiffs Subscribed to the Policy Insuring the TRITON.

27.     Plaintiffs subscribed to a Marine Hull and Machinery Insurance Policy B1098M203407 (the "Policy") issued to Tropic as the owner of the TRITON.  The Policy was placed by the insurance broker H. W. Wood Limited ("HWI").  The Policy incepted on February 10, 2020 and terminated on February 9, 2021.

28.     At the time the risk was presented for underwriting before the Policy was bound and incepted, HWI disclosed that the TRITON was in dry dock undergoing a refurbishment at the Delta facility in Seattle, Washington.

29.     The Policy provided coverage for the hull and for the materials and contents of the TRITON, including fine art, the engines, machinery and tenders provided on the schedule.  The Policy provided coverage for personal effects.  The TRITON was insured for a value of $20 million in United States currency.

### Delta Plans a Relaunch of the TRITON for Sea Trials.

30.     Once Delta completed all planned maintenance, improvements, and repairs to the TRITON, Delta commenced preparation for the relaunch of the TRITON using Big Bob.

31.     On August 14, 2020, Delta rolled Big Bob into the South Finish Shed and placed it into position over the TRITON.  Big Bob lifted the TRITON from keel blocks, side supporting struts, and concrete blocks.  The blocks were shifted into another position, and then Big Bob lowered the TRITON onto the keel blocks.  The hull of the TRITON remained supported by the slings of Big Bob for approximately 6 days.

32.     Delta's employee, Graeme Heys, advised the TRITON captain and crew that the relaunch was scheduled for August 20, 2020 at approximately 4:00 p.m.

33.     On August 20, 2020, the TRITON captain and crew attended a meeting with Delta representatives, including Graeme Heys, to discuss Delta's launch procedure of the TRITON, as

COMPLAINT FOR DAMAGES - 7

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

well as the towing procedures and mooring procedures that would be followed by Delta once the TRITON was in the water.

34.     The TRITON had previously been lifted, launched, and hauled out of the water by Delta employees and equipment on several occasions without incident or damage to the TRITON.

35.     Prior to August 20, 2020, the TRITON had never been lifted, hauled out of the water, or launched by any entity or shipyard other than Delta.

36.     Prior to the planned relaunch of the TRITON on August 20, 2020, the vessel Captain, Shaun Falconer, the Chief Engineer, and the Second Engineer closed all through hull valves, raw water valves, discharge tree valves, main and generator exhaust raw water valves, main sea strainer and cross-over pipe valves.  In addition, the TRITON crew made an independent walk through of the TRITON ensuring all watertight doors and hatches were closed prior to the launch.

37.     The TRITON captain and crewmembers took every precaution within their control to assure that the TRITON was properly prepared before the relaunch and prior to turning over sole control of the TRITON to Delta.

38.     At all times, the TRITON was under the exclusive care, custody and control of Delta during the relaunch.

39.     At all times, Delta controlled the means, method, and implementation of the relaunch of the TRITON.

40.     Delta employees designed and created the lifting plan of the TRITON for the planned relaunch on August 20, 2020.

41.     Delta was solely responsible for calculating the weight of the vessel for the relaunch, and using equipment with a load capacity sufficient to support and safely launch the TRITON.

42.     At all relevant times, Delta's agents and employees were responsible for safely operating all equipment, including Big Bob, to launch the TRITON without damage.

**Big Bob Was Not Inspected, Maintained, or Used within Regulatory Limits.**

43.     State law, federal law, industry regulations all impose certain requirements for the

COMPLAINT FOR DAMAGES - 8

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

maintenance and safe operation of cranes, including Big Bob. MTI's manufacturer recommendations also prescribe certain maintenance and operation requirements that apply to Big Bob.

44.     Delta hired Kendrick to maintain and repair Big Bob in the period preceding the TRITON's relaunch.

45.     On information and belief, Delta, or Delta's agent Kendrick,  hired Arxcis to inspect and certify Big Bob in the period preceding the TRITON's relaunch.

46.     29 CFR 1926.554 stated, in part, "[t]he safe working load of the overhead hoist, as determined by the manufacturer, shall be indicated on the hoist, and this safe working load shall not be exceeded." 29 CFR 1926.554 applied at all times to Big Bob.

47.     Big Bob stated on the hoist that the safe working load was 400 Metric Tons.

48.     The weight of the TRITON exceeded 400 Metric Tons.

49.     29 CFR 1910.179 required certain crane inspections, and specifically required periodic inspections, to include examinations for "excessive wear of chain drive sprockets and excessive chain stretch." 29 CRF 1910.179 also required rated load tests of cranes and required reports of such testing to be placed on file. 29 CFR 1910.179 applied at all times to Big Bob.

50.     WAC 296-56-60097 required crane operators to cause proof load testing at least once during each twelve-month period. WAC 296-56-60097 applied at all times to Big Bob.

51.     On information and belief, Delta, Kendrick, and Arxcis failed to properly examine Big Bob for "excessive wear of chain drive sprockets and excessive chain stretch."

52.     On information and belief, Delta, Kendrick, and Arxcis failed to perform required rated load tests of Big Bob and keep reports of such testing on file as required by 29 CFR 1910.179 and WAC 296-56-60097.

53.     WAC 296-56-60083 applies to cranes and specifies that "the manufacturer's (or design) rated loads for the conditions of use must not be exceeded." WAC 296-56-60083 applied at all times to Big Bob.

54.     Delta intentionally, knowingly, and recklessly exceeded the rated load for the

COMPLAINT FOR DAMAGES - 9

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

conditions of use when hoisting the TRITON with Big Bob. At all relevant times, Delta knew, or should have known that Big Bob might fail, causing catastrophic damage to TRITON.

55.     WAC 296-56-60085 provided, in part, that cranes must be fitted with a load indicating device and "[a]ll weight indications, other types of loading indications, and other data required must be readily visible to the operator." WAC 296-56-60085 applied at all times to Big Bob.

56.     Big Bob's load indicating device was above eye level and was not readily visible to the operator, which was a defective design.

57.     WAC 296-56-60098 required crane operators to perform an inspection in conjunction with each annual proof load tests and specifies that "all safety devices must be examined for malfunction" and "load…indicators must be checked over their full range.  Defects in such indicators must be immediately corrected." WAC 296-56-60098 applied at all times to Big Bob.

58.     Delta, Kendrick, and Arxcis failed to perform required tests of Big Bob's safety devices and load indicators as required by WAC 296-56-60098.

59.     MTI prescribed certain maintenance and inspections to be performed on Big Bob, including daily, weekly, monthly, biannual, and annual assessments. The required maintenance and inspections were set out in the manual.

60.     Delta, Kendrick, and Arxcis failed to perform the maintenance and inspections on Big Bob as required by the machine's manual.

61.     Big Bob's manual stated: "IMPORTANT! An overload warning alarm (Page 3-14) will sound when either hoist is overload (pointer is in the RED area of the gauge).  When you hear the alarm, stop and redistribute the load.  If both gauges are in the RED, the load is too heavy for the machine to lift."

62.     Big Bob's manual stated: "The overload alarm is located in the engine control box (Figure 3-20).  When the load indicator gages determine there is an overload situation on the hoist system the alarm will sound."

COMPLAINT FOR DAMAGES - 10

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

63.    On information and belief, Delta caused Big Bob's overload alarm to be disabled.

64.    Kendrick and Arxcis failed to test Big Bob's alarm and certified Big Bob for operation despite the alarm's malfunction.

65.    Kendrick and Arxcis failed to repair or reactivate Big Bob's alarm.

66.    Delta's employees knew, or should have known, that the TRITON's Lightship Weight—without fuel, water or crew, was a minimum of 451.58 Metric Tons or 995,563 pounds, which exceeded the capacity of Big Bob by at least 115,563 pounds.

67.    Delta's employees knew, or should have known, that continually leaving the TRITON suspended on the Travelift would create chronic stress on Big Bob, ultimately leading to a mechanical failure.

**Delta's Relaunch Failed Catastrophically, Damaging the TRITON.**

68.    After the TRITON captain and crew left the vessel, Delta's agents and employees remained aboard the TRITON to assure that the vessel was watertight and in a sufficient condition for the safe relaunch.

69.    At approximately 4:15 p.m. on August 20, 2020, Big Bob lifted the TRITON from her keel blocks and began to roll towards Delta's launching ramp on the Duwamish River.

70.    At approximately 4:24 p.m. as Big Bob began to lower the TRITON into the water, the components in Big Bob's R2 housing shuddered and failed.  The hydraulic winch drum control box exploded as the chain on the cog of the winch snapped and punctured through the bottom of the winch housing. The wire rope supporting the sling beneath the TRITON unraveled and the yacht's stern was dropped into the Duwamish River to a depth of ten feet.

71.    The bow of the TRITON remained in the slings of Big Bob above the water line.

72.    During the mechanical failure, Big Bob's remaining slings were rendered functionless, thus preventing employees from lowering the bow of the TRITON.

73.    Big Bob was overloaded at the time of the mechanical failure.

74.    Big Bob's overload alarm was not audible prior to Big Bob's mechanical failure.

75.    The TRITON's fishing cock pit was submerged to above the bulwarks on the

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

starboard side of the yacht. The interior of the TRITON's stern flooded.  The engine control room, engineer's cabin, engineer's head, engineer's store room and the lazarette of the TRITON flooded.

76.     The TRITON remained submerged in the Duwamish River for more than 45 minutes, causing catastrophic damage to the TRITON and its equipment and furnishings.

77.     The bow of the TRITON was eventually lowered and the dewatering process commenced.  The TRITON was moved to the service dock at Delta.

78.     The TRITON crew took all steps to minimize the damage.  The submerged areas of the yacht were dewatered, rinsed with fresh water, dried and blown out with fans.

79.     Captain Shaun Falconer documented the TRITON's stern dropping in a video.  The catastrophic damage to the TRITON was documented in photographs.

### The Post Marine Casualty Inspections.

80.     Tropic provided Plaintiffs with notice under the Policy of the damage to the TRITON caused by the failure of Big Bob. Plaintiffs instructed a marine surveyor at Charles Taylor to conduct a marine survey of the damage to the TRITON.

81.     Tropic also retained a separate marine surveyor, Dick Bloomquist, to conduct a separate marine survey and inspect the damage resulting from the mechanical failure of Big Bob.

82.     At all relevant times herein, Delta and its insurers were aware of the extensive damage caused to the TRITON as a result of the actions of Delta and its agents, servants, and employees.

83.     Delta instructed a marine surveyor to attend the joint inspection of the TRITON and to assess the damage to the yacht.

84.     The marine surveyors in attendance at a joint inspection of the TRITON confirmed the extent of the damage to the TRITON as well as the interior furnishings, and personal possessions of Tropic and the TRITON's crew.

85.     On information and belief, Delta, Kendrick, and MTI retained experts and conducted a separate inspection of Big Bob.

COMPLAINT FOR DAMAGES - 12

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

**The TRITON is Repaired at the Delta Shipyard.**

86.     On information and belief, Delta provided notice of the marine casualty to its liability underwriters and insurers.

87.     Neither Delta nor its insurers agreed to pay for the necessary repairs for the damage to the TRITON caused by Delta, in breach of the provisions of the Delta Contract.

88.     Delta repaired the TRITON at the Delta shipyard facility in Seattle and billed Tropic for all repairs to restore the TRITON to its pre-casualty condition.

89.     The crew of the TRITON, including the Captain, remained employed by Tropic for work on the TRITON until the repairs arising out of the failure of Big Bob were repaired.

**Plaintiffs Indemnified Tropic For Damage Caused by Defendants.**

90.     Plaintiffs indemnified Tropic in the amount of $3,448,110.86 in United States currency in full satisfaction of the repairs and the Hull Claim under the Policy for damage to the TRITON, exclusive of the deductible paid by Tropic.

91.     The Policy provided that Tropic would was responsible for  a $100,000.00 U.S. deductible for each and every loss.

92.     Tropic executed a Policy Release of All Claims and Subrogation Receipt (the "Release") in June 2022.  The Release contained an assignment and subrogation receipt of all of Tropic's claims and causes of action against any and all third parties causing damage to the TRITON, including, but not limited to,  Delta, Kendrick, and MTI.

93.     To date, neither Delta, Kendrick, Arxcis, nor MTI have agreed to pay either Tropic or Plaintiffs for the damages caused to the TRITON.

94.     Plaintiffs are entitled to recover the full amount of indemnification  Plaintiffs paid to Tropic, collect on behalf of Tropic the  $100,000.00 U.S. deductible Tropic shouldered under the Policy, prejudgment interest, legal costs, and attorneys' fees from Delta, Kendrick, Arxcis, and MTI.

**Plaintiffs Seek Evidence of Big Bob's Failure from Delta.**

95.     Plaintiffs have continually sought a thorough investigation of Big Bob's failure and

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

resulting drop of the TRITON.

96.     Despite Plaintiffs' good faith efforts, Delta has continued to deny access to certain pieces of evidence resulting in the Travelift's failure.

97.     During a site inspection at Delta in October 2022, Delta provided access to certain parts that were compromised during the TRITON's drop and failure of Big Bob.

98.     Conspicuously absent at the inspection were the wire rope that failed, as well as any electrical cables that were severed thus resulting in the immobilization of Big Bob's additional slings.

99.     To date, Delta has ignored Plaintiffs' inquiries regarding the location and preservation of these vital pieces of evidence.

100.    On information and belief, Delta caused or allowed the wire rope that failed, as well as any electrical cables that were severed to be lost or destroyed.

## FIRST CAUSE OF ACTION:

## GROSS NEGLIGENCE AGAINST DELTA

101.    Plaintiffs reallege and reincorporate the foregoing allegations as if stated herein.

102.    Delta was required to exercise reasonable care while the TRITON was in its possession and control, including exercising reasonable care in maintaining and repairing any machinery for use with the TRITON.

103.    Delta failed to exercise even slight care while the TRITON was in its possession and control, including failing to exercise even slight care in maintaining and repairing any machinery for use with the TRITON.

104.    At all relevant times, Delta represented that its employees had the requisite skill and care to perform the work on the TRITON, a valuable asset requiring a high level of expertise and specialized equipment to work on and maintain.

105.    Despite Delta's representations, Delta used Big Bob to lift and transport the TRITON throughout its facilities, disregarding Big Bob's safe loading capacity.

COMPLAINT FOR DAMAGES - 14

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

106. Delta used Big Bob to suspend the TRITON for an extended period of time.

107. Extended suspension of a heavy load, such as the TRITON, increases the risk of a crane's mechanical failure.

108. The continued overloading of Big Bob provided mechanical stressors that ultimately resulted in its catastrophic failure.

109. Delta failed to cause Big Bob to be inspected and repaired as required by federal and state law, including, without exclusion: 29 CFR 1926.554, 29 CFR 1910.179, WAC 296-56-60083, WAC 296-56-60085, and WAC 296-56-60097.

110. Delta failed to cause Big Bob to be inspected and repaired in accordance with Big Bob's operating manual.

111. Delta's failure to comply with state and federal law in inspecting, maintaining, and certifying Big Bob resulted in Big Bob's mechanical failure caused damaged to the TRITON.

112. At all relevant times herein Delta's actions and the actions of its agents, servants, and employees, or those for whom Delta had responsibility, were intentionally reckless or grossly negligent in wanton disregard of the foreseeable consequences of extreme property damage and potential threat to human life.

113. Delta's agents, servants, and employees intentionally and recklessly overloaded Big Bob during the relaunch of the TRITON. Delta knew, or should have known in reasonable prudence, that the Big Bob would likely cause damage to the TRITON.

114. Delta's employees were responsible for dogging down interior doors in order to minimize flooding in the event of water intrusion.

115. Delta's employees intentionally or recklessly did not properly protect TRITON before the sea trials, resulting in severe damage to the yacht from water intrusion.

116. By habitually overburdening Big Bob, using Big Bob to lift loads exceeding its capacity, and neglecting to properly secure the interior of the TRITON, Delta created the conditions for a foreseeable catastrophe—the failing of the lift and flooding of the yacht.

117. Delta's failure to exercise even slight care for the TRITON was the proximate cause

COMPLAINT FOR DAMAGES - 15

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

of the failure of Big Bob during the relaunch, partially submerging the TRITON in the Duwamish for over 45 minutes, resulting in catastrophic damage to the yacht and its interior.

118.    At all times herein, Delta breached the warranty of workmanlike performance implied in all shipbuilding contracts to perform the work on the TRITON in a safe and workmanlike manner.

119.    At all times herein, Delta's grossly negligent and intentional acts and omissions were made wantonly, in reckless disregard of the foreseeable consequences of damage to the TRITON, its owners and Plaintiffs herein.

120.    Delta's intentional failure to perform its manifest duty to carefully operate Big Bob and care for the TRITON while the Vessel was in Delta's exclusive care, custody, and control was reckless and constituted gross negligence.

121.    Delta's gross negligence and intentional, wanton disregard for the TRITON and duty of reasonable care to Tropic prevents Delta from limiting its liability for the damage to TRITON under the  Exculpatory Provision contained in the Delta Contract.

122.    As a result of Delta's gross negligence and intentional reckless  acts and omissions, the Exculpatory Provisions and all limitations of liability in the Delta Contract are unenforceable against Plaintiffs pursuant to the federal general maritime law and as a matter of public policy.

123.    As a result of Delta's gross negligence and intentional wanton and reckless acts and omissions, Delta is fully liable to Plaintiffs for the full amount of repairs to the TRITON and Tropic's deductible.

124.    As a result of Delta's gross negligence and intentional wanton and reckless acts and omissions, Delta is liable to Plaintiffs for all prejudgment interest on the repair costs to the TRITON, all attorneys' fees and legal costs incurred by Plaintiffs.

## SECOND CAUSE OF ACTION:

## GROSS NEGLIGENCE AGAINST KENDRICK AND ARXCIS

125.    Plaintiffs reallege and reincorporate the foregoing allegations as if stated herein.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

126.   Kendrick was required to properly maintain and monitor the condition of Big Bob.

127.   In particular, Kendrick was charged with observing any signs of mechanical stress on the machine, putting it at risk of catastrophic failure.

128.   Kendrick failed to exercise even slight care in maintaining and inspecting Big Bob.

129.   Kendrick's inspections and repair of Big Bob failed to comply with federal and state law, including 29 CFR 1926.554, 29 CFR 1910.179, WAC 296-56-60083, WAC 296-56-60085, and WAC 296-56-60097.

130.   Because of Kendrick's negligent maintenance and failure to identify signs of mechanical stress on Big Bob, the machine failed, resulting in the drop of the TRITON.

131.   Arxcis was required to inspect and certify Big Bob for safe operation.

132.   Arxcis failed to exercise even slight care in inspecting and certifying Big Bob.

133.   Arxcis's inspection and certification of Big Bob failed to comply with federal and state law, including 29 CFR 1926.554, 29 CFR 1910.179, WAC 296-56-60083, WAC 296-56-60085, and WAC 296-56-60097.

134.   The joint failure of Kendrick and Arxcis to comply with state and federal law in inspecting, maintaining, and certifying Big Bob resulted in Big Bob's mechanical failure and thereby caused the TRITON damage.

135.   The failure of Kendrick, and Arxcis to exercise slight care was the proximate cause of the failure of the relaunch and Big Bob dropping TRITON into the Duwamish River where it was  partially submerged for over 45 minutes, resulting in catastrophic damage to the yacht and its interior.

## THIRD CAUSE OF ACTION:

## NEGLIGENCE AGAINST KENDRICK AND ARXCIS

136.   Plaintiffs reallege and reincorporate the foregoing allegations as if stated herein.

137.   Kendrick was required to properly maintain and monitor the condition of Big Bob.

138.   In particular, Kendrick was charged with observing any signs of mechanical stress

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

on the machine, putting it at risk of catastrophic failure.

139.    Kendrick failed to exercise reasonable care in maintaining and inspecting Big Bob.

140.    Kendrick's inspections and repair of Big Bob failed to comply with federal and state law, including 29 CFR 1926.554, 29 CFR 1910.179, WAC 296-56-60083, WAC 296-56-60085, and WAC 296-56-60097.

141.    Because of Kendrick's negligent maintenance and failure to identify signs of mechanical stress on Big Bob, the machine failed, resulting in the drop of the TRITON into the Duwamish River.

142.    Arxcis was required to inspect and certify Big Bob for safe operation.

143.    Arxcis failed to exercise reasonable care in inspecting and certifying Big Bob.

144.    Arxcis's inspection and certification of Big Bob failed to comply with federal and state law, including 29 CFR 1926.554, 29 CFR 1910.179, WAC 296-56-60083, WAC 296-56-60085, and WAC 296-56-60097.

145.    The failure of Kendrick and Arxcis to comply with state and federal law in inspecting, maintaining, and certifying Big Bob resulted in Big Bob's mechanical failure and thereby caused damage to the TRITON.

146.    The failure of Kendrick and Arxcis to exercise reasonable care was the proximate cause of the failure of Big Bob and marine casualty, dropping the TRITON in the Duwamish River where it remained submerged for over 45 minutes, resulting in catastrophic damage to the vessel, its interior, and furnishings.

## FOURTH CAUSE OF ACTION:

## BREACH OF CONTRACT AGAINST DELTA

147.    Plaintiffs reallege and reincorporate the foregoing allegations as if stated herein.

148.    The Delta Contract executed by Delta and Tropic provided that Delta would perform maintenance, updating, and repairs of the TRITON at Delta's shipyard facility in Seattle in accord with "Owner's [Tropic's] instruction and good marine practice."

COMPLAINT FOR DAMAGES - 18

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

149.   The Delta Contract also provided that all repairs and work performed would be "free from defects in material and workmanship and conform to express specifications."

150.   In addition to "the bottom job, exterior paint work, and additional work as directed," the Delta Contract provided that Delta would "Haul Block Launch" the TRITON.

151.   The Delta Contract provided that Delta was not responsible for loss or damage "beyond the sole control of the yard."

152.   Delta was in sole control of the TRITON during its relaunch on August 20, 2020.

153.   Delta failed to use safe equipment in performing the "Haul Block Launch" duties provided in the Delta Contract, resulting in catastrophic damage to the TRITON.

154.   Delta breached the Delta Contract by recklessly and intentionally overloading Big Bob and breaching the "good marine practice" provision and other duties and obligations under the Delta Contract to perform the Delta Contract in a safe, workmanlike manner with safe equipment.

155.   Delta breached the warranty of workmanlike performance implied into ship repair contracts under the federal general maritime law.

156.   Delta breached the express provisions of the Delta Contract by failing to exercise good "marine practice" in performing the work provided for in the Delta Contract.

157.   Delta breached the Delta Contract by recklessly, wantonly and intentionally failing to exercise even slight care  for the TRITON and causing catastrophic damage to  the TRITON during relaunch of the yacht before sea trials.

158.   Delta is not entitled to limit its liability to Plaintiffs pursuant to the Exculpatory Provision contained in Section 6 of the Delta Contract.

159.   Although Delta was responsible for the damage to the TRITON, Delta failed and refused to pay for repairs to the TRITON in accord with Section 5—LIMITED WARRANTY AND EXCLUSIVE REMEDY of the Delta Contract. Delta breached the Delta Contract by failing to pay for all repairs to the TRITON to restore the yacht to its pre-casualty condition.

160.   Delta  breached the Delta Contract and Plaintiffs are entitled to recover all sums

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

paid to Tropic, along with recovery of Tropic's deductible, prejudgment interest, and attorneys' fees and legal costs in accord with Section 11 of the Delta Contract.

## FIFTH CAUSE OF ACTION:
## PRODUCTS LIABILITY AGAINST MTI

161.    Plaintiffs reallege and reincorporate the foregoing allegations as if stated herein.

162.    One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if (1) the seller is engaged in the business of selling such a product, and (2) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

163.    MTI sold the Travelift—Big Bob—to Delta in a defective condition unreasonably dangerous to its users and the vessels lifted by it, including the TRITON.

164.    Big Bob's electronics were not properly sheathed so as to remain functional following the machine's failure. Due to this design, upon failure Big Bob was unable to lower the TRITON into the Duwamish prior to the tide's entry. This failure resulted in additional damage to the TRITON.

165.    Big Bob lacked adequate safety features that would notify an operator of excess weight conditions. The sole visual indicator of weight on the lift was a pair of fogged dials with a coarse weight index. The dials were located well above eye level and in a location that would be hazardous for viewing while the lift was in operation.

166.    MTI's design of Big Bob's alarm system allowed the alarm to be turned off or rendered non-functional, resulting in an operator's ability to chronically overload the machine.

167.    Big Bob's design failures caused damage to the TRITON and MTI is liable to Plaintiffs.

COMPLAINT FOR DAMAGES - 20

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

052976.0002/9227652.1

**<u>SIXTH CAUSE OF ACTION:</u>**

**<u>SPOLIATION OF EVIDENCE AGAINST DELTA</u>**

168.     Plaintiffs reallege and reincorporate the foregoing allegations as if stated herein.

169.     Spoliation is the intentional destruction of evidence punishable by proper relief fashioned by the Court.

170.     Following Big Bob's drop of the TRITON into the Duwamish River and resulting catastrophic damage to the TRITON, Delta should have and did anticipate the possibility of litigation.

171.     On information and belief, Delta did not maintain the wire rope that failed or any of the electrical housing that may have prevented Big Bob from lowering the bow of the TRITON.

172.     Because Delta did not maintain these pieces of evidence, Plaintiffs are precluded from examining critical evidence regarding Big Bob's failure and the resulting drop of the TRITON.

173.     Delta knew or should have known that the wire rope and electrical housing was relevant evidence.

174.     Plaintiffs are entitled to all relief against Delta for the failure to preserve relevant evidence as determined by this Court.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray for the following relief from this Court:

(a)     For Judgment against Defendants for the full repairs to the TRITON, including Tropic's deductible of $100,000 in an amount to be determined at trial.

(b)     For an adjudication that all Defendants are jointly and severally liable for damage to the TRITON.

(c)     An award to Plaintiffs against all Defendants for all legal costs, attorneys' fees, prejudgment interest, and legal costs.

(d)     For a remedy fashioned by this Court against Delta for spoliation of evidence.

(e)     For all other relief determined by this Court to be just and equitable.

COMPLAINT FOR DAMAGES - 21

052976.0002/9227652.1

DATED:  January 4, 2023.

LANE POWELL PC


By:    *s/ Katie Smith Matison*
Katie Smith Matison, WSBA No. 20737

*s/ Katie Bass*
Katie Bass, WSBA No. 51369

*s/ Jesse Miles*
Jesse Miles, WSBA No. 58096

1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, Washington 98111-9402
Telephone:  206.223.7000
matisonk@lanepowell.com
bassk@lanepowell.com
milesj@lanepowell.com

Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES - 22

052976.0002/9227652.1