1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

MS AMLIN MARINE NV, SYNDICATE
0457, SYNDICATE 1969, SYNDICATE
2791, SYNDICATE 5000, CONVEX
INSURANCE UK LTD, and
UNDERWRITERS AT LLOYD'S
LONDON SUBSCRIBING TO POLICY
B1098M203407,

CASE NO. 2:23-cv-14

OMNIBUS ORDER

12                    Plaintiffs,

13          v.

14

15

16

17

DELTA MARINE INDUSTRIES INC,
MARINE TRAVELIFT INC,
KENDRICK EQUIPMENT (USA) LLC,
KENDRICK EQUIPMENT LTD, and
ARXCIS INC,

                    Defendants.

18

19

20

21

22

23

## 1. INTRODUCTION

This case involves property damage to the TRITON, a pleasure yacht. After completing work on the yacht, Defendant Delta Marine Industries ("Delta") used a Marine Travelift informally known as "Big Bob" to lower the yacht into the Duwamish River. Unfortunately, Big Bob failed, dropping the TRITON and

partially sinking it. Plaintiffs represent the Yacht's insured. Defendants Kendrick Equipment (USA) LLC and Kendrick Equipment LTD (collectively, "Kendrick") routinely inspected Big Bob before the accident, as did Defendant Arxcis Inc. Plaintiffs have sued Kendrick and Arxcis for negligence and gross negligence and Delta for gross negligence. *See* Dkt. No. 1.

This Omnibus Order resolves the following motions:

> Dkt. No. 55—Plaintiffs' Motion for Summary Judgment RE Vessel Repair Contract and Spoliation of Evidence;

> Dkt. No. 58—Plaintiffs' Motion for Partial Summary Judgment Against Arxcis and Kendrick Defendants;

> Dkt. No. 96—Delta's Motion to Supplement the Record on Summary Judgment;

> Dkt. No. 105—Delta's Motion for Summary Judgment;

> Dkt. No. 115—Kendrick's Motion for Summary Judgment;

> Dkt. No. 120—Plaintiffs' Motion to Exclude Delta's Experts and Strike Expert Reports;

> Dkt. No. 126—Arxcis's Motion for Summary Judgment; and

> Dkt. No. 131—Delta's Motion to Exclude Under Fed. R. Evid. 702.

Having considered the briefing, the record, and the relevant law, the Court finds oral argument unnecessary. Being fully informed, the Court rules as explained below.

## 2. BACKGROUND

Delta is a Seattle company that builds and repairs luxury yachts. It built the 163-foot pleasure-yacht at issue here, the TRITON. During its construction, the TRITON's architect designed a "lift plan" for the vessel that would allow Delta—or another shipyard—to lift and haul the TRITON out of the water. In designing the lift plan, the architect calculated the vessel's lightship weight (i.e., its weight when empty). Then, the architect added a margin to the lightship weight. Without the margin, the lightship lift weight of the TRITON was 837,603.72 pounds. *See* Dkt. No. 55 at 8 (citing Dkt. No. 57[1]). Adding the margin brought the TRITON's weight to 880,188.20 pounds. Based on these calculations, Delta asserts that the lift plan for the TRITON assumed an 840,000-pound yacht. Dkt. No. 66 at 5 (citing Dkt. No. 57).

### 2.1 The accident and subsequent investigation.

In October 2019, the TRITON's owner entered a vessel repair contract with Delta to haul the TRITON out of the water for service, repair, and refilling. *See* Dkt. No. 107-1. The vessel repair contract included a provision limiting Delta's liability to $300,000 for any damage to the TRITON. *Id*. at 3.

On October 8, 2019, Delta used a Model 400-C Marine Travelift Boat Hoist named "Big Bob" to lift the TRITON out of the water. At the same time, Delta

---

[1] Dkt. No 57 is sealed by the Court's prior Orders. Dkt. Nos. 91 and 95. The Court includes discrete, factual information from Dkt. No. 57 in this Order, finding that the disclosure of this limited information will not invade Delta's proprietary interests.

weighed the TRITON on its scales and recorded the vessel's weight at about 956,000 pounds. Dkt. No. 56-1 at 38. Big Bob has a rated lift capacity of 880,000 pounds, and its manual instructs users not to hoist a vessel that is "beyond capacity." Dkt. No. 55 at 4.

On the topic of lift capacity, Delta maintains that Big Bob's manufacturer, Marine Travelift, promised that Big Bob was tested and capable of safely lifting 125 percent of its rated 880,000-pound capacity, or 1,102,311 pounds. Dkt. No. 66 at 7 (citing Dkt. No. 67-5). Delta also maintains that Big Bob had an alarm that would sound if it was overloaded with more than 880,000 pounds. *Id.* at 8 (citing Dkt. No. 69 at 5). And Delta asserts that Big Bob's alarm has never sounded when lifting the TRITON. *Id.*; *see also* Dkt. No. 69 at 5.

On August 20, 2020, after Delta had completed its work on the TRITON, it used Big Bob to lower the TRITON into the Duwamish. As Delta's agents lowered the TRITON, Big Bob failed and dropped the TRITON's aft end—its rear—into the river. The impact damaged the TRITON's exterior, and the vessel partially flooded. Delta asserts that at the time of the incident, "an electrical cable was severed," which prevented Delta's agents from restarting Big Bob's motor. Dkt. No. 66 at 11 (citing Dkt. No. 67-1 at 38–39). To restart Big Bob and finish lowering the rest of the TRITON into the water, Delta agents quickly cut and respliced the severed cable. *Id.* (citing Dkt. No. 67-1 at 38–39). Now, Delta asserts that it does not know where the potentially defective piece of cable went.

During the failure, several of Big Bob's components broke, including its "R2 hoist chain," which was housed inside the "R1/R2 Winch Housing," or "hoist

enclosure." *See* Dkt. No. 134-1 at 12, 20. Delta did not recover these components from the Duwamish after the failure, including several links from the broken hoist chain. *See id*. Accordingly, the Parties could not inspect or test those links. *See id*.

The TRITON's captain reported the accident that same day to the Marshall Islands flag state by phone, following up via email the next day. *See* Dkt. No. 76 at 168. In the follow-up email, the captain confirmed that "[t]he relevant insurance companies and underwriters of all parties involved have been contacted." *Id*. at 169. They also confirmed that "[a] full investigation of the accident will be undertaken by marine surveyors and insurance/ underwriters." *Id*.

About a week later, a representative of Defendant Marine Travelift inspected Big Bob "to help determine the cause of the casualty and restore the lift to working order." Dkt. No. 66 at 11–12; *see* Dkt. No. 67-1 at 59–60. According to Delta, Marine Travelift's representative told Delta to throw away a severed wire rope that snapped during the accident and to replace. Dkt. No. 66 at 12; *see* Dkt. No. 67-1 at 45–47. Delta claims the TRITON's captain was present and agreed that the wire rope was unrelated to Big Bob's failure and could be discarded. So Delta threw it away.

About nine days after the incident, Delta disassembled Big Bob's motor and tested its components without notifying any other interested parties or their insurers. Dkt. No. 55 at 11 (citing Dkt. No. 56-1 at 49); *see also* Dkt. No. 134-1 at 20; Dkt. No. 66 at 12. Delta maintains that it put all the motor's components into storage after disassembly, and that it documented the disassembly process through photographs. *See* Dkt. No. 66 at 13 (citing various declarations and photographs).

**2.2    Arxcis's and Kendrick's pre-accident inspections.**

Both Arxcis and Kendrick inspected Big Bob numerous times before the accident. Arxcis inspected and certified Big Bob annually. *See* Dkt. No. 145-1 at 30–33. And Kendrick regularly inspected Big Bob for its manufacturer, Marine Travelift, Inc. Neither Arxcis nor Kendrick noted any problems with the R2 hoist chain that Plaintiffs allege caused Big Bob's failure. At least one of Delta's agents testified that they relied on these inspections. *See e.g.*, Dkt. No. 56-1 at 18. Plaintiffs claim that Arxcis and Kendrick failed to meet the standard of care when inspecting and certifying Big Bob and its rated lift capacity.

## 3.    DISCUSSION

### 3.1    Legal standards.

#### 3.1.1    Summary judgment.

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On summary judgment, the Court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Hawai'i Disability Rts. Ctr. v. Kishimoto*, 122 F.4th 353, 363 (9th Cir. 2024). Additionally, on summary judgment, parties may only submit evidence that "could be presented in an admissible form at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).

### 3.1.2    The general maritime law.

The Court applies the general maritime law to Plaintiffs' contract and tort claims. This body of law is "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Espinoza v. Princess Cruise Lines, Ltd.*, 581 F. Supp. 3d 1201, 1220 (C.D. Cal. 2022) (quoting *E. River S.S. Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 865 (1986)). "Absent a relevant statute, the general maritime law, as developed by the judiciary, applies." *Id*. at 1220–21 (quoting *E. River S. S. Corp.*, 476 U.S. at 864). Indeed, "[w]hen a federal court decides a maritime case, it acts as a federal 'common law court,' much as state courts do in state common law cases." *Air and Liquid Sys. Corp. v. DeVries*, 586 U.S. 446, 452 (2019) ("Subject to direction from Congress, the federal courts fashion federal maritime law.").

"In formulating federal maritime law, the federal courts may examine, among other sources, judicial opinions, legislation, treatises, and scholarly writings." *Id*. Courts supplement the general maritime law as announced by federal courts with applicable state law, "so long as [the] state law is 'compatible with substantive maritime policies.'" *Espinoza*, 581 F. Supp. 3d at 1221 (quoting *Yamaha Motor Corp. U.S.A. v. Calhoun*, 516 U.S. 199, 207 (1996*)); see also Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959) (explaining the court has a duty to declare and apply the general maritime law, "free from inappropriate common-law principles").

1

**3.2    MS Amlin's claims are not time-barred.**

2

To start, Delta maintains that Plaintiffs' claims are time-barred based on the

3

one-year limitation period found in the TRITON's vessel repair contract. The

4

Parties agree that the vessel repair contract is a maritime contract, governed by the

5

general maritime law. *See* Dkt. No. 66 at 20. The contract states:

6

> TIME LIMIT FOR FILING CLAIM—(A) [Delta] shall be discharged
> from all liability for defective workmanship or material or for loss or
> damages unless . . . Litigation is commenced within one year after
> completion by . . . [Delta] of the work performed or the earlier sale or
> transfer of the vessel . . . .

7

8

9

Dkt. No. 107-1 at 4.

10

Days before the limitation period expired, however, Plaintiffs, Delta,

11

Kendrick, and Marine Travelift entered a separate agreement ("Agreement"), in

12

which they agreed to toll the limitation period and to complete a pre-suit mediation

13

within 120 days. Dkt. No. 107-23.[2] Below are some of the Agreement's relevant

14

provisions:

15

- "The Parties agree to submit the dispute . . . to mediation . . . within
  120 days." *Id*. at 4.

16

17

- "MS Amlin has agreed not to file suit until the Mediation occurs . . . ."
  *Id*.

18

- "[T]his Tolling Agreement tolls all suit limitation clauses, statutes of
  limitations, [and] deadlines for all claims . . . relating to the Re-

19

20

[2] "Parties to a contract can agree to a shorter limitations period than that called for
in a general statute." *Mattingly v. Palmer Ridge Homes LLC*, 238 P.3d 505, 513
(Wash. Ct. App. 2010) (quoting *Yakima Asphalt Paving Co. v. Dep't of Transp.*, 726
P.2d 1021, 1023 (Wash. Ct. App. 1986)). "Unambiguous contractual time limits on
actions are enforceable if they are not unconscionable, do not violate statute or
public policy, and allow the plaintiff a reasonable period of time to ascertain and
investigate the claim and prepare for the controversy." *Id*.; *see also Yakima Asphalt
Paving Co.*, 726 P.2d at 1023.

21

22

23

Launch and any lawsuits arising ou[t] of the Re-Launch [] [are] tolled." *Id.* at 6.

- "[T]his Tolling Agreement . . . shall remain in effect until Twenty (20) Days after the conclusion of the Mediation." *Id.* at 5.

- "MS Amlin has agreed not to file suit . . . while this Tolling Agreement remains in effect." *Id.* at 6.

- "MS Amlin . . . [may] fil[e] suit . . . if the Mediation is not successful and MS Amlin withdraws from the Tolling Agreement." *Id.*

- "This Tolling Agreement may be terminated by any Party by written notice to all other Parties (the "Termination"). The Termination of the Tolling Agreement shall be effective Twenty (20) Days from the date that written notice is delivered to [all] counsel . . . . ." *Id.*

- "If no Party terminates this Tolling Agreement through written notice, the Tolling Agreement shall automatically expire and terminate Twenty (20) Days after termination of the Mediation . . . ." *Id.*

- "This Agreement may not be changed or terminated, or any performance or conditions waived in whole or in part except by a writing signed by all Parties." *Id.*

The Parties signed the agreement on April 26, 2022, meaning the mediation should have occurred by no later than August 24, 2022. *See* Dkt. No. 107-23 at 7–9. It did not.

Plaintiffs contend that Delta repeatedly cancelled and rescheduled mediation dates well past the 120-day deadline. On November 2, 2022, Plaintiffs' counsel emailed the other parties to the Agreement to give notice of Plaintiffs' withdrawal from the Agreement so that Plaintiffs could file this lawsuit. *See* Dkt. No. 111 at 2–3. According to Plaintiffs, this action prompted an immediate response from Delta,

and the Parties continued to try to resolve the case through mediation rather than

litigation. *See id*. As Plaintiffs' counsel explains:

> [Under the Agreement], the parties exchanged voluminous documents, and participated in an inspection of the Marine Travelift . . . . Delta's counsel were particularly interested in mediating with Judge John Erlick ("Ret."). The parties attempted unsuccessfully to organize a mediation at JDR with Judge Erlick. Various mediation dates were cancelled. In frustration with the inability to schedule a simple mediation, I sent an email withdrawing from the Agreement on November 2, 2022.
>
> My email was a catalyst and the parties began performing the Agreement . . . . On December 6, 2022, mediation was scheduled with Judge Erlick at JDR for March 14, 2023. The parties circulated a protocol for a metallurgical exam on December 23, 2022[.]

*Id*. at 2. Plaintiffs argue that the Parties each acted as though they believed the

Agreement still bound their conduct. Dkt. No. 110 at 22–23.

### 3.2.1    The Agreement's tolling provisions did not automatically expire after a "120-day term."

Delta argues first that Plaintiffs' claims are time-barred because "[t]he 120-

day 'term' of the Agreement came and went on August 26, 2022[,] without any

mediation."[3] Dkt. No. 105 at 22. "Accordingly," Delta argues, "plaintiffs had 28 days

after August 26, 2022[,] to file suit." [4] *Id*.

But Delta's argument contradicts the Agreement's plain language, and so the

Court rejects it. *See DeForge Maritime Towing, LLC v. Alaska Logistics, LLC*, 591

---

[3] Delta's briefing cites August 26, 2022, as the end of the alleged 120-day term. Dkt. No. 105 at 22. But the Agreement was signed on April 26, 2022. Dkt. No. 107-23 at 7. And 120 days from April 26, 2022, is August 24, 2022. Thus, the Court assumes that Delta intended to write August 24, 2022, but made a typographical error. Either way, this small difference in dates does not affect the Court's analysis.
[4] *See supra* n.3.

1   F. Supp. 3d 939, 948 (W.D. Wash. 2022) (explaining that under federal maritime

2   law, "[c]ontract terms are to be given their ordinary meaning, and . . . the plain

3   language of the contract should be considered first") (internal quotations omitted));

4   *S/Y Palidor, LLC v. Platypus Marine, Inc.*, Case No. 3:22-cv-05591-LK, 2024 WL

5   4277855, at *7 (W.D. Wash. Sept. 24, 2024) ("Maritime contracts 'must be construed

6   like any other contracts: by their terms and consistent with the intent of the

7   parties.'" (quoting *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 589 U.S. 348,

8   355 (2020)); *see also Holcim Canada Holdings LLC v. Barge Eagle, Inc.*, 737 F.

9   Supp. 3d 1106, 1111 (W.D. Wash. 2024) (maritime case explaining that "[w]hen the

10  district court's decision is based on analysis of the contractual language and an

11  application of the principles of contract interpretation, that decision is a matter of

12  law." (quoting *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985)).

13      While the Parties agreed to submit their claims to mediation within 120 days,

14  they did not agree to limit the tolling period to 120 days, nor did they agree that the

15  tolling period would automatically expire if no mediation occurred within 120 days.

16  Rather, the Agreement states that its tolling provisions automatically terminate 20

17  days after the mediation ends. Dkt. No. 107-23 at 6; *see also id*. at 5 ("MS Amlin has

18  agreed not to file suit until the Mediation occurs between the Parties and the

19  Parties have executed the Tolling Agreement below in Section V."). It is undisputed

20  that the mediation never occurred. Thus, the Agreement's tolling provisions did not

21  automatically expire.

1

2

### 3.2.2    Delta is equitably estopped from arguing that Plaintiffs' claims are untimely.

In the alternative, Delta argues that tolling terminated on November 22, 2022—20 days after Plaintiffs affirmatively withdrew from the Agreement via email. Delta maintains that Plaintiffs' email triggered the Agreement's termination provision, which states: "This Tolling Agreement may be terminated by any Party by written notice . . . [and] shall be effective Twenty (20) days from the date that written notice is delivered to counsel representing all Parties and signing this Agreement." Dkt. No. 107-23 at 6. Because there were eight days remaining in the contractual limitation period before the Parties signed the tolling agreement, Delta maintains that Plaintiffs had until November 30, 2022, to file suit. In response, Plaintiffs maintain that Delta is equitably estopped from making this claim.

Because this action is governed by the general maritime law, federal common law will control the question of equitable estoppel. *See Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 762 (9th Cir. 1981) (holding that when action arises under federal law, "federal common law rather than state law, was controlling with respect to availability of equitable estoppel defense."). "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Comm. Health Servs. of Crawford Cnty.*, 467 U.S. 54, 59 (1984).

The Supreme Court has described the doctrine of equitable estoppel as a "flexible" one, while "consistently affirm[ing] the importance of detrimental reliance in estoppel determinations." *Keller Found. / Case Found. v. Tracy*, 696 F.3d 835, 847 (9th Cir. 2012). "In contract law specifically, equitable estoppel generally arises to

'preclude[ ] one who accepts the benefits from repudiating the accompanying or resulting obligation.'" *Kingsley Cap. Mgmt., LLC v. Sly*, 820 F. Supp. 2d 1011, 1023 (D. Ariz. 2011) (quoting Am. Jur. 2d *Estoppel and Waiver* § 60 (footnote omitted)). "Parties cannot accept benefits under a contract fairly made and at the same time question its validity." *Id.* (quoting Am. Jur. 2d *Estoppel and Waiver* § 60 (footnote omitted)).

Plaintiffs relied on Delta's conduct to their detriment and Delta's benefit. Plaintiffs signaled their intent to terminate the Agreement by withdrawing from it, but Delta, Kendrick, and Marine Travelift expressed a renewed commitment to the Agreement by continuing the pre-suit information exchange and attempting to schedule a mediation even after the supposed effective date of the Agreement's termination. *See* Dkt. No. 111-1 at 14–25; *see also* Dkt. No. 107-23 at 6 ("The Termination of the Tolling Agreement shall be effective Twenty (20) Days from the date that written notice is delivered to counsel[.]"). Indeed, within a few days of receiving the termination notice, Delta and the other Defendants began scheduling examinations and testing of Big Bob's retained components and planning for the anticipated mediation. In other words, at every turn, Delta acted as if the Agreement was still in place. Given Delta's continued compliance with the Agreement in response to Plaintiffs' notice, it was reasonable for Plaintiffs to believe that: (1) Plaintiffs had successfully repudiated any withdrawal from the Agreement before the Agreement terminated; (2) the Agreement was still effective; and (3) Delta would not argue that the Agreement's tolling provisions had terminated on the grounds that Plaintiffs withdrew from the Agreement. *See*

*Kingsley Cap. Mgmt., LLC*, 820 F. Supp. 2d at 1023 (quoting Am. Jur. 2d *Estoppel and Waiver* § 60 (footnote omitted)). Plaintiffs changed their position relying on Delta's conduct and continued to forbear litigation while the parties worked toward a pre-suit mediation with Delta's preferred mediator. Delta accepted the benefit of Plaintiffs' continued forbearance under the Agreement, so it would be inequitable for Delta to avoid the Agreement's burdens or obligations while Plaintiffs suffer a harsh outcome as a result of their reliance. *See id.*

According to Delta, Plaintiffs cannot assert equitable estoppel because they "never pleaded equitable estoppel" in their complaint. Dkt. No. 118 at 6. But Delta's cited authority does not support its argument. Further, such a requirement would be illogical, as Plaintiffs' equitable estoppel argument is responsive—or a "shield"—to Delta's affirmative defense. In this case, it is not a separate claim or affirmative defense that would need to be pled.

Similarly, Delta argues that Plaintiffs must plead and prove fraudulent concealment. Dkt. No. 118 at 6. But again, Delta's authority is not convincing. Most of the cases that Delta cites apply equitable estoppel to toll statutes of limitations—not contracts like the one at issue here. *See e.g.*, *Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1090, 1096–97 (9th Cir. 2021) (equitable tolling of limitations was unwarranted and parties could not revive the statute of limitations through contract); *Huseman v. Icicle Seafoods, Inc.*, 471 F.3d 1116, 1124 (9th Cir. 2006) (because defendant-employer had no duty to affirmatively disclose facts underpinning seaman's claim, seaman was not excused from filing within the statute of limitations); *Johnson v. Henderson*, 314 F.3d 412, 415–16 (9th Cir. 2002)

(defendant-employer's conduct did not obviate requirement that plaintiff-employee seek EEO counseling within 45 days of alleged harassment); *Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996) (discussing fraudulent concealment as an *equitable tolling doctrine* that tolls the statute of limitations when the defendant engages in conduct that would "lead a reasonable person to believe that he did not have a claim for relief"). These cases focus on whether the defendant's wrongful conduct prevented the plaintiff from filing their legal claims within the applicable statute of limitations. *See Huseman v*, 471 F.3d at 1121 (quoting *Atkins v. Union Pac. R.R.*, 685 F.2d 1146, 1149 (9th Cr. 1982)) ("[C]onduct or representations by the defendant-employer which tend to lull the plaintiff into a false sense of security, can estop the defendant from raising the statute of limitations on the general equitable principle that no man may take advantage of his own wrong"). Given their dissimilarity, these cases are not that helpful.

Delta also cites *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090 (9th Cir. 2005), which discusses a contractual limitations clause in addition to a statute of limitations. There, Thorman's employment contract and the applicable statute of limitations provided the same, six-month time limit for his claims. *Id*. at 1093 (citing 46 U.S.C. § 10602) ("Thorman did not commence this lawsuit until . . . well past the six-month limitation set forth both in the contracts and by statute for in rem wage claims brought by crew members aboard fishing vessels."). Thorman argued that the defendant concealed information from him such that he could not have reasonably brought his claims on time, and he expressly pursued a claim of fraudulent concealment.

1  But here, there is no statute of limitations problem. And unlike *Thorman*,

2  Plaintiffs' equitable estoppel theory is based on Plaintiffs' contract with Delta—not

3  on any argument that Delta concealed facts about Plaintiffs' claim and rendered

4  Plaintiffs unable to file their claims on time. Given these key differences, *Thorman*

5  does not foreclose the Court's application of equitable estoppel here. *See Kingsley*

6  *Cap. Mgmt., LLC*, 820 F. Supp. 2d at 1023 (quoting Am. Jur. 2d *Estoppel and*

7  *Waiver* § 27) ("A more definite statement of equitable estoppel's elements is difficult

8  because the claim 'rests upon the facts and circumstances of the particular case in

9  which it is urged[.]'").

10  Delta is thus equitably estopped from asserting that Plaintiffs' claims are

11  time barred under the vessel repair contract.[5]

12  **3.3    The Court grants in part Delta's motion to exclude Plaintiffs'**
   **experts.**

13  Delta moves to exclude certain expert testimony under Federal Rule of

14  Evidence 702. "Rule 702 . . . tasks a district judge with 'ensuring that an expert's

15  testimony both rests on a reliable foundation and is relevant to the task at hand.'"

16  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting

17  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Under the rule, a

---

[5] In the alternative, the Court finds that issues of material fact related to Delta's alleged gross negligence preclude summary judgment in Delta's favor on its limitations clause defense. *See infra,* Section 3.6.2; *see also Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1014–16 (9th Cir. 1999) ("[A] party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence").

witness with the requisite "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent [of the testimony] demonstrates to the court" that these requirements are met on a more-probable-than-not basis:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The second requirement—"sufficient facts or data"—"requires foundation, not corroboration." *Elosu*, 26 F.4th at 1025. Thus, consistent with their gatekeeping function, courts must decide whether an expert has "sufficient factual grounds on which to draw conclusions." *Id.* at 1025–26. The Ninth Circuit has repeatedly warned district courts that "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Id.* at 1026; *see also Hyer v. City and Cnty. of Honolulu*, 118 F.4th 1044, 1056–57 (9th Cir. 2024) (explaining that experts may rely on disputed facts to form their opinions). And "[s]haky but admissible evidence is to be attacked by cross-examination, contrary

1 evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598

2 F.3d 558, 564 (9th Cir. 2010).[6]

### 3.3.1    Hudson's and Venturella's expert opinions satisfy Rule 702(b)–(c).

Delta moves to exclude the opinions of Dr. Patrick Hudson, Ph.D., arguing

primarily that his opinions are not founded on sufficient facts and data as required

by Rule 702(b). Hudson opined about the cause of Big Bob's failure, but Delta

mostly challenges his conclusions about TRITON's weight at the time of the

accident.

Hudson has a Ph.D. in Civil (Ocean) Engineering; a B.S. Degree in Naval

Architecture, and he is a professional engineer with over 27 years of experience as

an engineer in the U.S. Navy. Dr. Hudson also taught Naval Architecture and

Ocean Engineering at the U.S. Naval Academy as a professor.

Here, Dr. Hudson reviewed deposition testimony and records, inspected the

TRITON and Big Bob, and he conducted destructive testing and analysis on Big

Bob's available parts. In his report, Dr. Hudson recounted the materials that he

relied on to determine the TRITON's weight. *See* Dkt. No. 134-1 at 16 (Hudson

Expert Report, "Weight of the Vessel"). This evidence includes many documents

created by Delta that purport to reflect or calculate the TRITON's weight at various

times. *See id*. Delta disagrees with the factual accuracy of the underlying evidence,

---

[6] Delta also maintains that "plaintiffs[] attempt to solicit undisclosed expert opinions from Marine Travelift." Dkt. No. 131 at 12. But Delta's motion to exclude expert testimony by Marine Travelift is insufficiently briefed; without additional factual information and legal authority, the Court will not address this issue.

primarily disputing the accuracy of its own 2005 stability report. *See* Dkt. No. 131 at 9. But the Court finds this is an adequate source of data from which Hudson may draw an opinion. Whatever quibbles Delta may have with the data are not grounds to exclude Hudson's opinion—Delta may address any alleged shakiness in his conclusions through cross-examination and the adversarial process at trial. *See also Hyer*, 118 F.4th at 1056–57; *Primiano*, 598 F.3d at 564.

Next, Delta argues that Dr. Hudson's causation theory is unsupported. Dr. Hudson opined that Delta's repeated overloading of Big Bob caused or contributed to the breakdown of Big Bob's parts, including the R2 hoist chain that snapped during the accident. Dr. Hudson concluded that the weakened R2 hoist chain failed first, triggering Big Bob's larger failure. On this point, Delta argues:

> Dr. Hudson's theory is that ***the chain*** failed, because ***the Travelift*** [Big Bob] was "repeatedly overloaded." . . . . Yet, it is not enough to suggest the Travelift was somehow wholistically 'repeatedly overloaded.' Dr. Hudson needs some facts about what force [Big Bob's] chain can withstand, as well as the forces placed on the chain, to show it was "repeatedly overloaded" and thus initiated the failure. . . . Dr. Hudson has no such facts or methodology.

Dkt. No. 131 at 10 (emphasis in original).

The Court disagrees with Delta's logic. Dr. Hudson's conclusion that the R2 hoist chain broke first and caused the larger failure is based on multiple considerations, including his own inspection of the available physical evidence after the incident. *See e.g.*, Dkt. No. 134-1 at 11. Through this inspection, Dr. Hudson considered and ruled out other components as the most likely cause of Big Bob's failure. *See id*. And Dr. Hudson explained that the repeated overloading of a Travelift like Big Bob leads to "compounding degradation of the crane including . . .

excess wear and tear on the hoist components," like the failing hoist chain. *See id*. at 23. He also concluded that Delta had repeatedly overloaded Big Bob. *See id*. Thus, the Court rejects Delta's argument and finds that Hudson had sufficient facts and data to form his opinion about the R2 hoist chain under Rule 702(b).

Delta also moves to exclude the testimony of Plaintiffs' expert, Michael Venturella, arguing that his opinions are inadmissible because he failed to use "reliable" evidence to calculate the TRITON's weight. *See* Dkt. No. 147 at 5 (Delta's reply brief clarifying the basis for motion). This argument fails for the same reasons stated above. Given the foregoing, the Court finds that Hudson's and Venturella's challenged opinions are based on sufficient facts and data under Rule 702(b).

As for Rule 702(c)'s requirement, the Court finds that the contested opinions come from reliable principles and methods. While the experts could have been more specific about their methods, their reports explained their review of the evidence and their reasoning such that the Court is satisfied their opinions are the product of reliable principles and methods on a more-likely-than-not basis. *See* Dkt. Nos. 113-1, 113-2, 134-1; Fed. R. Evid. 702(c).

### 3.3.2    Not all of Plaintiffs' proffered expert testimony meets Rule 702(a)'s "helpfulness" requirement.

Delta also moves to exclude Plaintiffs' expert testimony about regulations or other legal requirements that may apply to Delta because, it says, such testimony (1) would not "help the trier of fact to understand the evidence or to determine a fact in issue," under Rule 702(a); and (2) would constitute impermissible legal conclusions—or "opinion[s] on . . . ultimate issue[s] of law." *See* Dkt. No. 131 at 5

(quoting *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008)). As the Ninth Circuit has held, "testimony that simply tells the jury how to decide" a particular case is not "helpful" under Rule 702. *Nationwide Transp. Fin.*, 523 F.3d at 1059–60. Indeed, testimony that amounts to instructing the jury on the law governing the Parties' claims in a case is impermissible, as it invades the "distinct and exclusive province of the court." *See In re NFL's "Sunday Ticket" Antitrust Litig.*, Case No. ML 15-02668 PSG (SKx), 2024 WL 2075942, at *4 (N.D. Cal. May 7, 2024) (quoting *Nationwide Transp. Fin.*, 523 F.3d at 1063 (quoting *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004))). For instance, in this case, it would be unhelpful for an expert to opine on the legal standard for "gross negligence" and then conclude that Delta was or was not grossly negligent.

That said, experts do not provide inadmissible legal opinions every time they discuss sources of law. In fact, the Ninth Circuit has clarified that if an expert's opinion does not "represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, [then] the testimony is not an impermissible legal conclusion." *United States v. Diaz*, 876 F.3d 1194, 1199 (9th Cir. 2017). And notably, trial courts often allow experts to testify about regulations that support their standard-of-care opinions. *See Grandos v. N. Nev. High Speed, LLC*, No. 3:14-cv-00081-LRH-VPC, 2014 WL 5503118, at *3 (D. Nev. Oct. 30, 2014) (collecting cases); *see also Robertson v. Burlington N. R.R. Co.*, 32 F.3d 408, 410 (9th Cir. 1994) ("OSHA standards may be admitted . . . as some evidence of the applicable standard of care."). For example, Washington law unambiguously establishes that "a statute,

regulation, or other positive enactment may help define the . . . standard of care." *Xiao Ping Chen v. City of Seattle*, 223 P.3d 1230, 1240 (Wash. Ct. App. 2009) (emphasis added) (quoting *Owen v. Burlington N. & Santa Fe R.R. Co.*, 108 P.3d 1220, 1223 (Wash. 2005) (en banc)). And at least one court in this district has found that OSHA regulations "provide strong evidence of the standard of care" in maritime cases. *See McCoy v. Foss Maritime Co.*, 442 F. Supp. 2d 1103, 1112 (W.D. Wash. 2006) ("OSHA regulations provide strong evidence of the standard of care required by Foss on its uninspected vessels after 1984.").

Similarly, the Ninth Circuit has held that when "considered . . . in relation to all other evidence in the case," OSHA regulations and standards "may be admitted in a [Federal Employers' Liability Act] case as some evidence of the applicable standard of care." *Robertson*, 32 F.3d at 410–11. The Ninth Circuit affirmed the following jury instruction, which explains how the factfinder may consider regulations to help determine the standard of care as a factual matter:

> Evidence has been introduced in this case on the subject of Occupational Safety and Health Administration (OSHA) standards, Environmental Protection Agency (EPA) standards, and National Institute of Safety and Health (NIOSH) standards, for the limited purpose of suggesting noise level guidelines. These standards are binding on certain industries in the United States. In those industries as to which the standards are binding, a violation of the standards, standing alone, constitutes negligence as a matter of law. These standards are not binding on defendant Burlington Northern in this lawsuit. The issue of negligence in this case must be determined by you based upon all the evidence submitted to you, and by applying the law as I have instructed you.

*Id.* at 411.

Delta's arguments for exclusion fail mainly because they conflate "standard of care" with "duty of care," or "legal duty." Delta argues that "the worker-safety

1    regulations [Plaintiffs] seek to admit are inapplicable" because the regulations only

2    create legal duties "between employers and their employees." Dkt. No. 131 at 6

3    (quoting *Martino v. Kiewit N.M. Corp.*, 600 F. App'x 908, 912 (5th Cir. 2015)); *see*

4    *also Afoa v. Port of Seattle*, 296 P.3d 800, 808 (Wash. 2013) ("The Port is an

5    'employer' and Afoa is an 'employee' under the statute. That is all WISHA requires

6    for a specific duty to arise . . . ."). But this argument misses the issue here—whether

7    applicable regulations serve as *evidence* to help establish the relevant *standards of*

8    *care*. *See Granados*, 2014 WL 5503118, at *4 ("while OSHA regulations cannot form

9    the basis of negligence per se or a direct cause of action by a non-employee, such

10   regulations are admissible as evidence of the applicable standard of care, to be

11   considered along with other evidence of negligence"). Accordingly, the Court rejects

12   Delta's argument.

13       Next, citing *Barrett v. Lucky Seven Saloon*, 96 P.3d 386 (Wash. 2004) (en

14   banc), Delta contends that "regulations can only set a standard of care" if they meet

15   the elements laid out in the Restatement (Second) of Torts § 286 (1965). Dkt. No.

16   131 at 7. But *Barrett* is neither binding authority nor persuasive on this issue.

17       In *Barrett*, the Washington State Supreme Court held that a criminal

18   statute—RCW 66.44.200(1)—could only set a "standard of liability" if it met the test

19   set by Section 286 of the Restatement. *Barrett*, 96 P.3d at 391–92. While the court

20   used terms like "standard of liability," "standard of care," "minimum standard of

21   conduct," and "duty of care" interchangeably, the court ultimately held that the

22   defendant owed a legal duty to a particular plaintiff because RCW 66.44.200(1)

23   created such a legal duty. *See id*. at 270–71 (explaining that Washington precedent

has applied Section 286 to criminal statutes in chapter 66.44 RCW in order to "establish[] a duty of care" "apart from the common law [duty]"). As the Washington Court of Appeals later explained, "*Barrett* applied the [S]ection 286 four-factor test to determine whether RCW 66.44.200(1) establishes a duty of care to a particular plaintiff." *Mortensen v. Moravec*, 406 P.3d 1178, 1184 (Wash. Ct. App. 2017). This reasoning is consistent with pre-*Barrett* Washington precedent. *See Est. of Kelly v. Falin*, 896 P.2d 1245, 1247 (Wash. 1995) (en banc) (applying Section 286 to determine existence of legal duty, thereby answering "[t]he threshold question" in a negligence action of "whether a duty of care exists on the part of the defendant to the complaining party").

This case is distinct from *Barrett* because the general maritime law establishes a legal duty between Plaintiffs and Defendants. Thus, the Court need not consider any regulations to establish the *existence of a legal duty*. Again, the Court considers those regulations as evidence of the standard of care alongside other evidence in the case.

That said, the Court finds that Venturella's proposed testimony about the Clean Water Act is not relevant in determining the standard of care here. Whether Delta violated the Clean Water Act after Big Bob dropped the TRIDENT does not speak to whether Defendants reasonably maintained, inspected, or operated Big Bob. Nor do Plaintiffs contend that Delta could have lessened or avoided the damages they suffered by complying with the Clean Water Act or other environmental regulations. As Plaintiffs have failed to establish by a preponderance of the evidence that Venturella's planned testimony about the Clean Water Act and

1    other environmental regulations would be helpful, the Court excludes it. Fed. R.

2    Evid. 702(a).

3    **3.4    The Court grants in part Plaintiffs' motion to exclude Delta's**
4    **experts.**

5    ### 3.4.1    Delta failed to disclose its experts consistent with Rule
    26(a)(2)(B).

6        Plaintiffs moved to exclude each of Delta's retained experts under Federal

7    Rule of Civil Procedure 37(c) because Delta failed to disclose them in accordance

8    with Rule 26(a)(2)(B), which lays out the disclosure requirements for experts who

9    must provide expert reports. Plaintiffs' motion does not challenge Delta's disclosure

10    of its two percipient expert witnesses[7]—Delta's experts who need not provide expert

11    reports as provided by Rule 26(a)(2)(C). *See* Dkt. No. 121 at 5 (disclosure of "other

12    experts").

13        As a preliminary matter, Delta argues the Court should deny the motion as

14    an untimely discovery motion. *See* Dkt. No. 35 at 2. But a motion to exclude under

15    Rule 37(c) is properly considered as a motion for sanctions, not a motion "relat[ed]

16    to discovery." *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th

17    Cir. 2008). Indeed, district courts regularly consider motions in limine requesting

18    the exclusion of undisclosed evidence as a discovery sanction under Rule 37(c).

19    Given these considerations and the Court's inherent power to control its own docket,

20    the Court finds that Plaintiffs' motion is timely.

21

22

23    [7] Among other subjects, Delta's percipient experts will testify about industry
    standards governing Big Bob's maintenance and operation.

OMNIBUS ORDER - 25

1    Delta also asks the Court to deny the motion because Plaintiffs failed to meet

2    and confer, but the Court finds that the requirement was met during and after the

3    deposition of Delta's expert, Dr. Brian Flinn. *See* Dkt. No. 137 at 11–12, 17.

4    Turning to the merits, Rule 37(c)(1) states:

5    > If a party fails to provide information or identify a witness as required
6    > by Rule 26(a) or (e), the party is not allowed to use that information or
     > witness to supply evidence on a motion, at a hearing, or at a trial, unless
7    > the failure was substantially justified or is harmless. In addition to
     > or instead of this sanction, the court, on motion and after giving an
     > opportunity to be heard . . . [may order other sanctions].

8    Fed. R. Civ. P. 37(c)(1). "Exclusion is the appropriate remedy for failing to fulfill the

9    required disclosure requirements of Rule 26(a)." *Yeti by Molly, Ltd. v. Deckers*

10   *Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Indeed, the rule provides a

11   "self-executing" and "automatic sanction" that "gives teeth" to Rule 26(a)'s

12   disclosure requirements "by forbidding the use at trial of any information required

13   to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd.*, 259

14   F.3d at 1106 (quotation omitted).

15   When a party retains an expert witness, it must disclose the information

16   required by Rule 26(a)(2)(B). The disclosing party must provide its expert's written

17   report, which "must contain":

18   (i)    a complete statement of all opinions the witness will express and
            the basis and reasons for them;

19   (ii)   the facts or data considered by the witness in forming them;

20   (iii)  any exhibits that will be used to summarize or support them;

21   (iv)   the witness's qualifications, including a list of all publications
22          authored in the previous 10 years;

23

(v)     a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)    a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

To disclose its initial experts, Delta submitted a joint expert report signed by three experts. Likewise, to disclose its rebuttal experts, Delta submitted a joint report signed by the same three experts, plus one more expert. There is nothing "inherently impermissible" about joint expert reports under Rule 26—in truth, "[c]o-authored expert reports aren't exactly uncommon." *Dale K. Barker Co., P.C. v. Valley Plaza*, 541 Fed. App'x 810, 815 (10th Cir. 2013) (Gorsuch, J.). Co-authored expert reports make sense when both experts "reviewed the same materials, and, working together, came to the same opinions." *Id.* at 816; *see also Homesite Ins. Co.*, 2025 WL 35172, at *2 (collecting cases allowing joint expert reports). Joint expert reports, however, fail to meet disclosure requirements when they do not "reveal the division of labor between the . . . experts, [or] how they reached their separate opinions." *See Homesite Ins. Co.*, 2025 WL 35172, at *2. (collecting cases); *see also Dale K. Barker Co.*, 541 Fed. at 816 ("Perhaps the practice [of joint expert reports] could prove problematic in other circumstances—if, for example, it isn't clear whether both experts adhere to all of the opinions in the report and they do not delineate which opinions belong to which expert[.]"). Thus, "[w]hen two experts work as a team and divide up the work, the report must reveal this division of labor" to comply with Fed. R. Civ. P. 26(a)(2)(B). *Adams v. United States*, Case No. 4:CV 03-49-BLW, 2011 WL 2144574, at *1 (D. Idaho May 29, 2011). Joint reports

that fail to reveal the division labor fail to provide a complete statement of each witness's opinions, reasoning, and foundation. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii).

Delta's joint expert report and joint rebuttal report fail to meet Rule 26(a)(2)(B)'s disclosure requirements because they do not "reveal the division of labor between the . . . experts, []or how they reached their separate opinions." *See Homesite Ins. Co.*, 2025 WL 35172, at *2; *Adams*, 2011 WL 2144574, at *1; Fed. R. Civ. P. 26(a)(2)(B). Based on the format of the reports and their *joint* sworn declaration, it would appear that Delta's experts worked together to review the same evidence and reach the same conclusions. *See generally* Dkt. Nos. 106-1 at 1–2, 106-2. But that was not the case. As discussed below, while the experts state that they worked together, the record shows that they are not each independently capable of testifying to the entirety of the reports' foundation, methodologies, and conclusions.

Accordingly, the Court finds that Delta failed to disclose its experts in compliance with Rule 26(a)(2)(B)'s disclosure requirements.

### 3.4.2    Delta has not established that its failure to disclose was harmless or justified.

The penalty for violating Rule 26(a) can be harsh, often resulting in exclusion when a party fails to properly identify or disclose its experts. *See, e.g.*, *Rulffes v. Macy's W. Stores LLC,* No. 2:22-CV-1075, 2023 WL 5623207, at *4 (W.D. Wash. Aug. 31, 2023) (excluding as Rule 37 sanction for failure to meet disclosure requirements). Federal Rule of Civil Procedure 37(c)(1) imposes *automatic* sanctions when a party fails to disclose evidence as required by Rules 26(a), "unless the

1    failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The

2    burden is on the non-moving party to show that its failure to comply with its

3    discovery obligations was either substantially justified or harmless. *Yeti by Molly,*

4    *Ltd.*, 259 F.3d at 1107.

5        When deciding whether a Rule 26(a) disclosure violation is harmless, district

6    courts consider four factors: "(1) prejudice or surprise to the party against whom the

7    evidence is offered; (2) the ability of that party to cure the prejudice; (3) the

8    likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not

9    timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed. App'x

10    705, 713 (9th Cir. 2010). "At bottom, this is an equitable analysis entrusted to the

11    Court's discretion." *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 242 (D. Nev.

12    2017). "Lesser sanctions and other measures are generally more appropriate than

13    evidence preclusion when the disclosure is provided during the discovery period and

14    the delay can be remedied during the existing discovery period or with a limited and

15    brief extension of discovery." *Id.* at 243 (quoting *Jones v. Wal-Mart Stores, Inc.*,

16    Case No. 2:15-cv-1454-LDG-GWF, 2016 WL 1248707, at *7 (D. Nev. Mar. 28, 2016)).

17        Delta primarily argues that any disclosure violation is harmless because

18    Plaintiffs could not have legitimately been confused about its expert report and

19    rebuttal report.[8] Dkt. No. 122 at 4, 7. Delta contends that Plaintiffs chose to depose

---

[8] Delta claims that Plaintiffs' arguments are "histrionic in the extreme." Dkt. No. 122 at 4. An attorney who asks the court to enforce Rule 26(a) is not histrionic, hysterical, emotional, or melodramatic for doing so. While the Parties should feel free to assert that various arguments are inaccurate, misleading, or even deceptive in some cases, terms like "histrionic" are not helpful.

1    only one of the joint reports' co-authors—Dr. Brian Flinn—even though they knew

2    that Flinn could not testify to the whole report. In response, Plaintiffs explain that

3    they thought that Flinn served as the joint report's lead author and that he could

4    testify to the entire report. *See* Dkt. No. 120 at 3. Thus, Plaintiffs deposed only

5    Flinn.

6        After reviewing the record, the Court finds that given Delta's disclosures,

7    Plaintiffs' belief that Flinn could testify to the whole report was reasonable. Flinn's

8    name and signature appear first, and he seems to be the engineer with the highest

9    level of education on the project. *See* Dkt. No. 106-1 at 1. And along with signing the

10   joint declaration described above, Flinn also submitted a separate, personal

11   declaration in which he: (1) lists various opinions from the report; (2) declares that

12   "[he] and [his] co-authors will testify to the opinions stated in the report"; and (3)

13   confirms that "[a]ll of the opinions stated are given on a 'more probable than not'

14   basis." Dkt. No. 97 at 2–3.[9] Without any express delineation or clarification from

15   Delta, it was reasonable for Plaintiffs to assume that Flinn could testify to the joint

16   expert reports in their entirety.

17       During Flinn's deposition, however, Plaintiffs' assumption proved false. Many

18   of Flinn's answers confirmed that he would only offer "metallurgical/ material

19   science opinions." *See e.g.*, Dkt. No. 137 at 11. Notably, upon review of the joint

20   expert report's conclusions, it is unclear which ones constitute "metallurgical/

21

22   ─────────────────────
     [9] To accompany Flinn's declaration, Delta attached a version of the joint report with
     various conclusions highlighted. Dkt. No. 97-1. But Flinn's deposition testimony
     reveals that he cannot testify to each of these highlighted sections. *See* Dkt. No.
     124-1.

23

material science opinions." Flinn's deposition testimony muddied the waters further—he refused to commit to various conclusions in their entirety, stating he would only testify to discrete, yet still unclear aspects of those conclusions. The excerpts below from his deposition are illustrative:

> Q. So, Mr. Flinn, . . . [h]ave you ever seen this document before entitled Delta Marine Industries, U.S. Coast Guard, IMO, General Intact Stability Report? . . . .
>
> A. Perhaps. Is it -- I have to check. Is it in the documents we list in our report?
>
> Q. It's listed in your report. Okay. Have you ever seen the document before?
>
> A. There's a lot of documents. I looked through them. I don't have a specific recollection of it, but . . .
>
> Q. Okay. And, again, you testified earlier—do you see this word "light ship" with a weight 421, do you know what—you testified earlier you don't know what light ship weight is; is that correct?
>
> A. Yeah. I've heard it used. I don't know the exact definition of it, no.
>
> . . .
>
> Q. . . . . So are you—I'm trying to exclude what you don't know anything about, Mr. Flinn. Are you expressing any opinions about the light ship weight of the TRITON on August 30, 2005?
>
> A. *Not unless it relates to some metallurgical and material science aspect.*

Dkt. No. 137 at 9 (emphasis added).

> A. . . . . [T]here was no evidence that shows this lift didn't have the capacity to lift its nameplate capacity.
>
> Q. Is there anything to show that the lift had the capacity to lift greater than the nameplate capacity?
>
> ATTY. KRISHER: Objection, form and foundation. You can answer.

A. *Well, you know, I'm here for a metallurgical opinion*, but as an engineer, these machines have large factors of safety, you know, minimum of two, usually three to four. There are all sorts of events that had to be planned for, dynamic loads, a tire popping. Those things are all built in so that if there is a dynamic load that could exceed the nameplate capacity that the machine is safe and will operate.

Q. And so is your opinion about the condition of the Big Bob on August 20, 2020, before the accident based on the inspections that you reviewed from Arxcis and Kendrick?

ATTY. KRISHER: Objection, form and foundation.

A. *I'm here to give you metallurgical and material science opinions*. Okay. You're asking my general understanding of this. You know, we did a visual inspection of it . . . . There are—you know, the inspections and the maintenance records were reviewed by our team. *You know, they opined on those in the report.*

*Id*. at 10 (emphasis added).

Flinn also confirmed that he lacked the requisite knowledge to discuss various aspects of the reports and referred the deposing attorney to his co-authors for answers—effectively bandying about. *Id*. at 6. In light of Flinn's answers, the questioning attorney eventually asked Delta's counsel to schedule the other experts' depositions. *Id*. at 6–7. But Delta refused, stating that the discovery cutoff was fast-approaching, and that Plaintiffs had already deposed more than ten witnesses. *Id*.

Given all this, the Court finds that Delta's failure to disclose prejudiced Plaintiffs' ability to prepare for trial. *See Lanard Toys Ltd.*, 375 Fed. App'x at 713. Plaintiffs were unable to cure the prejudice through additional depositions during or shortly after the discovery window. *See id*. The Court further finds that Delta's conduct was willful. *See id*. Delta is presumed to know Rule 26(a)(2)(B)'s expert report and disclosure requirements. Delta knew or should have known that its

1   expert reports were inadequate but failed to correct them or otherwise adequately

2   disclose their experts. Delta's disclosure does not even satisfy Rule 26(a)(2)(C)'s less

3   stringent disclosure requirement—applicable to experts *without* written reports—as

4   Delta failed to explain: "(i) the subject matter on which the witness is expected to

5   present evidence under Federal Rule of Evidence 702 . . . and; (ii) a summary of the

6   facts and opinions to which the witness is expected to testify." Fed. R. Civ.

7   P. 26(a)(2)(C).

8       The Court considers Delta's proposed lesser sanctions. *Merch. v. Corizon*

9   *Health, Inc.*, 993 F.3d 733, 741 (9th Cir. 2021) (noncompliant party must "avail

10  himself of the opportunity to seek a lesser sanction" by formally requesting one from

11  the district court (citation omitted)). Delta requests that it be required to create and

12  file an annotated report, at its own expense, showing which of its experts can testify

13  to which portions of the report. Delta has already created this annotated report and

14  filed it. The Court has reviewed it and finds that this supplemental disclosure is not

15  an adequate sanction.

16      Under these circumstances, the Court finds that Delta failed to comply with

17  Rule 26, that its failure was neither substantially justified nor harmless, and that

18  Rule 37 sanctions are thus warranted. But excluding *all* Delta's retained experts is

19  too severe a penalty—while exclusion would not amount to a dispositive sanction, it

20  would strike a heavy blow against Delta's ability to defend itself here. Unlike the

21  cases in which a late expert disclosure *completely* robbed a party of a meaningful

22  opportunity to prepare for trial, Plaintiffs had actual knowledge of both the identity

23  of Delta's retained experts and their substantive findings and opinions, though

1    without attribution. As a practical matter, Plaintiffs could have pursued further

2    discovery or even motion practice to clear up any confusion about who was

3    responsible for which expert opinion. So this is not a case of trial by ambush.

4        Accordingly, the Court excludes the expert testimony of Robert Basile,

5    Andrew Marchesseault, and Grant Quiller under Rule 37(c). As Plaintiffs had the

6    opportunity to depose Flinn, the Court will allow Flinn to testify within the scope of

7    his deposition and those portions of the joint expert report and rebuttal report

8    attributed to him. *See* Dkt. Nos. 124-1, 124-2.

9    **3.5    The Court grants in part Plaintiffs' motion for spoliation sanctions.**

10       District courts have inherent authority to sanction spoliation. *Ski Lifts, Inc.*

11   *v. Schaeffer Mfg. Co.*, Case No. C19-0062-JCC, 2020 WL 1492676, at *3 (W.D. Wash.

12   Mar. 24, 2020) (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).

13   Spoliation is the "destruction or significant alteration of evidence, or the failure to

14   preserve property for another's use as evidence, in pending or future litigation." *Id.*

15   (quoting *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009)). "The

16   bare fact that evidence has been altered or destroyed 'does not necessarily mean

17   that the party engaged in sanction-worthy spoliation.'" *Reinsdorf v. Skechers U.S.A.,*

18   *Inc.*, 296 F.R.D. 604, 626 (C.D. Cal 2013) (quoting *Ashton v. Knight Transp., Inc.*,

19   772 F. Supp. 2d 772, 799–800 (N.D. Tex. 2011)). Sanctions are appropriate when the

20   court finds:

21       (1) that the party having control over the evidence had an obligation to
             preserve it at the time it was destroyed;

22       (2) that the records were destroyed with a 'culpable state of mind;' and

1
2

      (3) that the evidence was "relevant" to the party's claim or defense such
          that a reasonable trier of fact could find that it would support that
          claim or defense.

3

4

*Id.* at 626 (list reformatted) (quoting *Zublake v. UBS Warburg LLC*, 220 F.R.D. 212,

220 (S.D.N.Y. 2003)); *see also Ski Lifts, Inc.*, 2020 WL 1492676, at *4 (quoting *Apple*

5

6

*Inc. v. Samsung Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (collecting cases

adopting test)). While this test expressly references "destroy[ing]" evidence, it also

7

applies when a party has significantly altered or failed to preserve evidence.

8

9

*Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*, Case No: 1:17-cv-

00519-DCN, 2019 WL 2236080, at *6 (D. Idaho May 21, 2019) (citing *Reinsdorf*, 296

10

F.R.D. at 626).

11

12

        Preliminarily, the Court rejects Delta's argument that "[t]he disassembly of

the motor, fully photographed with the component parts preserved, cannot be said

13

to have resulted in the spoliation of anything." Dkt. No. 66 at 27. Many courts have

14

found that disassembling a product relevant to the litigation is sanctionable

15

conduct. *See e.g.*, *Dickinson Frozen Foods, Inc.*, 2019 WL 2236080, at 16–17. For

16

example, one district court found that a party acted "recklessly in executing its

17

duties to preserve crucial evidence [i.e., a malfunctioning FPS Freezer] [] by failing

18

to allow [the defendant] to observe disassembly or to store the FPS Freezer, [and] by

19

damaging parts of the FPS Freezer and significantly altering the Refrigeration

20

System prior to allowing [the defendant's] expert an opportunity to inspect [it] . . . ."

21

*Id.* at *17. In that case, the court concluded that the spoliating party's conduct

22

"constitute[d] sufficient culpability to justify an adverse inference." *Id.*

23

1

2

### 3.5.1    Delta had a duty to preserve when it destroyed and altered evidence.

Applying the first factor of the spoliation analysis, "[i]t is well established that the 'duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation.'" *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) (quoting *Ashton*, 772 F. Supp. 2d at 800). "Stated differently, the duty to preserve is triggered 'not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation.'" *Morford v. Wal–Mart Stores, Inc.*, No. 2:09–cv–02251–RLH–PAL, 2011 WL 635220, at *3 (D. Nev. Feb. 11, 2011); *see also Ski Lifts, Inc.*, 2020 WL 1492676, at *4.

Delta argues that sanctions are inappropriate because it did not anticipate potential litigation. Dkt. No. 66 at 26. But any reasonable person should anticipate getting sued after partially sinking a 163-foot-pleasure-yacht—especially if that person had a vessel repair contract with the yacht's owner that limited liability to $300,000 absent a finding of gross negligence.

If the basic facts of the incident were not enough to put Delta on notice of potential future litigation, the record shows that Delta knew an investigation of the incident would occur, and that the interested parties' marine surveyors and insurance companies would be involved. Indeed, the TRITON's captain reported the incident to the Marshall Islands flag state by phone on August 20, 2020—the day of the accident—and followed up via email the next day, confirming that "[t]he relevant insurance companies and underwriters of all parties involved ha[d] been

1

2

3

4

contacted." *Id*. at 169. The captain also confirmed that a "[a] full investigation of the accident w[ould] be undertaken by marine surveyors and insurance/ underwriters." *See id*. And Delta concedes that it knew insurance companies would be investigating so that they could "sort it out." Dkt. No. 66 at 26.

5

6

7

8

9

While Delta may have hoped that no lawsuit would result, a reasonable person would have anticipated litigation. Thus, the Court finds that Delta's duty to preserve evidence arose no later than August 21, 2020, at which point it should have "reasonably know[n]" that Big Bob's components "may be relevant to anticipated litigation." *See Morford*, 2011 WL 635220, at *3.

10

11

### 3.5.2    Delta had a culpable state of mind as to the severed rope and the failed motor, which were each relevant.

12

13

14

15

16

17

18

19

As for the second factor, the Ninth Circuit has found that a "culpable state of mind" includes a party's "conscious disregard" of its discovery obligations; the moving party need not prove bad faith. *Apple Inc.*, 888 F. Supp. 2d at 988 (citing *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988)); *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 n.2 (9th Cir. 1992) (explaining the Ninth Circuit has "confirmed the power of the district court to sanction under its inherent powers not only for bad faith, but also for willfulness or fault by the offending party").

20

21

22

23

The Court finds that Delta consciously and willfully disregarded its discovery obligations when it: (1) discarded the wire rope that snapped during TRITON's failed launch and (2) tested and disassembled Big Bob's failed motor before other parties' experts could examine it. As noted above, Delta knew or should have known

1    that Big Bob's components—especially its failed motor and any other compromised

2    parts—would be relevant to potential future litigation.

3          Delta argues that it did not have a culpable state of mind when it discarded

4    the severed rope because it relied on Marine Travelift's representation that it could

5    throw the rope away. This explanation is unpersuasive. While Delta may not have

6    acted with *malicious* intent or in bad faith, it knew or should have known of its

7    obligation to preserve Big Bob and its components. *See Apple Inc. v. Samsung Elecs.*

8    *Co.*, 881 F. Supp. 2d 1132, 1147 (N.D. Cal. 2012) ("But 'bad faith' is not the required

9    mental state for the relief [the party moving party] seeks. All that the court must

10   find is that [alleged spoliating party] acted with a 'conscious disregard' of its

11   obligations."). Delta also claims that it "had no idea that the wire rope or the broken

12   cord were relevant to any future litigation . . . ." Dkt. No. 66 at 27. But surely it had

13   *some idea* Big Bob's broken and failed components would be relevant in litigation

14   about the cause of Big Bob's failure. And by actively throwing away the wire rope

15   that snapped during the accident, Delta consciously disregarded its duty to

16   preserve.

17         The Court does not find, however, that Delta acted with a culpable mindset

18   when its agents spliced and lost portions of the severed electrical cable *during* the

19   accident. Delta's agents were responding to an emergency and attempting to

20   mitigate damages to the TRITON after Big Bob failed. Because they damaged and

21   likely lost portions of the defective wire cable while trying to restart Big Bob in the

22   immediate aftermath of the accident, the Court does not conclude that Delta acted

23   with a "conscious disregard" for any discovery obligations at that time.

### 3.5.3    Sanctions are appropriate.

If the moving party establishes that spoliation occurred, then various sanctions—including an adverse inference—may be appropriate. *Apple Inc.*, 888 F. Supp. 2d at 989–90 (collecting cases); *see also Reinsdorf*, 296 F.R.D. at 626. In evaluating sanctions for spoliation, the district court should remember to exercise its inherent power "only to the degree necessary to redress the abuse." *Reinsdorf*, 296 F.R.D. at 626 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991)). And "[t]o decide which spoliation sanction, if any, to impose, courts generally consider: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Dickinson Frozen Foods, Inc.*, 2019 WL 2236080, at *6 (citing *Reinsdorf*, 296 F.R.D. at 626).

Having already concluded that Delta's actions constituted a conscious and willful disregard of its discovery obligations, the Court finds that Delta's "degree of fault" is high. *See id*. As for prejudice, Plaintiffs' expert—Hudson—testified that Delta's actions "hampered the analysis of the cause of the failure," and that "without examining the missing parts . . . . there was no way to know if they contributed to the failure of the Travelift." Dkt. No. 134-1 at 20. Accordingly, Plaintiffs suffered substantial prejudice.

As for the nature of the sanctions, the Court finds that an adverse inference regarding the wire rope and the condition of the engine is appropriate. The Court will fashion the scope and language of this adverse inference at a later date, with input from the Parties.

**3.6    The Parties' Motions for Summary Judgment.**

Plaintiffs filed two motions for partial summary judgment—one against Delta and one against Arxcis and Kendrick. Dkt. Nos. 55, 58. Defendants each filed separate motions for summary judgment dismissal. Dkt. Nos. 55, 58. Given the overlap, the Court addresses the motions together, by issue. In the future, the Parties are encouraged to file cross-motions. *See* LCR 7(k).

### 3.6.1    Arxcis and Kendrick owed Plaintiffs a duty of care, but the factfinder must determine breach and causation.

Plaintiffs' Motion for Partial Summary Judgment against Arxcis and Kendrick requests affirmative summary judgment on the duty element of their negligence claims against Arxcis and Kendrick. Dkt. No. 58. Specifically, Plaintiffs argue that Arxcis and Kendrick owed Plaintiffs a legal duty to act reasonably under the circumstances when they inspected Big Bob, and that they breached that duty. Arxcis's and Kendrick's motions for summary judgment assert that they owed no legal duty to Plaintiffs because they performed the relevant inspections under contract for Delta and had no legal relationship with Plaintiffs. Dkt. Nos. 115, 126. Arxcis and Kendrick also request summary judgment on the grounds that Plaintiffs' evidence fails to establish breach and causation.

#### 3.6.1.1  *Arxcis and Kendrick owed a legal duty to Plaintiffs.*

Under the general maritime law, Arxcis and Kendrick owed Plaintiffs a duty of reasonable care under the circumstances such that they may be liable to Plaintiffs for negligence.

"[N]egligence is an actionable wrong under the general maritime law." *Id.* (quoting Thomas J. Schoenbaum, 1 Admiralty & Mar. Law, § 5:4 Negligence (6th ed. Nov. 2020)); *see also Leathers v. Blessing*, 1005 U.S. 626, 629 (1881). "To recover for negligence, a plaintiff must establish: (1) duty; (2) breach; (3) causation; and (4) damages." *Id.* (quoting *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1070 (2001)). Under the general maritime law, "plaintiffs are owed a duty of care reasonable under the circumstances." *Id.* (citing *Kermarec*, 358 U.S. at 632); *see also Shaw v. United States*, 436 F. Supp. 3d 1315, 1327 (N.D. Cal. 2020) ("A 'duty of reasonable care under the circumstances' applies in maritime negligence actions." (quoting *Christensen v. Georgia-Pacific. Corp.*, 297 F.3d 807, 815 (9th Cir. 2002)); *Cabading v. Port of Portland*, 598 F. Supp. 3d 1009, 1024 (D. Or. 2022) (holding that under the general maritime law, the lessee of waterfront property owed a duty of reasonable care under the circumstances to those who used the property).

As the Ninth Circuit has recognized, "[i]n maritime tort cases, general principles of negligence law guide the federal courts." *Peters v. Titan Nav. Co.*, 857 F.2d 1342, 1345 n.1 (9th Cir. 1988) (citing *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987). And under those principles, the concept of foreseeability circumscribes a tortfeasor's legal duty. *Consol. Aluminum Corp.*, 833 F.2d at 67  (quoting Harper, James & Gray, *The Law of Torts, Scope of Duty in Negligence Cases* § 18.2 at 655 (2d ed. 1986)); *cf. Peters*, 857 F.2d at 1345, 1345 n.1 (applying Fifth Circuit maritime precedent to evaluate limitations on defendant's legal duty, but not using the term "foreseeability"); *Christensen*, 279 F.3d at 816 (finding that "[a] genuine issue of material fact [existed] as to whether [plaintiff's]

injury was a foreseeable result of [defendant's] acts," but evaluating "foreseeability" under the negligence element of proximate cause rather than legal duty). The Ninth Circuit has relied on Fifth Circuit maritime precedent that elaborates on the relationship between legal duty and foreseeability:

> Foreseeability obviously marks the limits placed on a defendant's duty; the precise meaning of the concept is vital . . . .
>
> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.

*Id.* at 67–8.

Applying these foundational tort principles, the Court finds that Plaintiffs were "owed a duty of reasonable care under the circumstances" by Arxcis and by Kendrick. The Court also finds that the common law tort principle of foreseeability supports that duty because Plaintiffs' harm was a foreseeable consequence of Arxcis's and Kendrick's allegedly inadequate inspections. In other words, Arxcis and Kendrick owed Plaintiffs a duty of reasonable care when inspecting Big Bob because a reasonable person in either of their positions would have assumed that their failure to use such care during an inspection would result in the kind of harm that Plaintiffs experienced.

### 3.6.1.2  The factfinder must determine breach and causation.

The Court finds that Plaintiffs submitted evidence of breach by Arxcis and by Kendrick, as well as causation. Starting with evidence of Arxcis's alleged breach of duty, Plaintiffs' evidence shows that Arxcis failed to act with reasonable care under

the circumstances during its annual inspections and re-certification of Big Bob. For each inspection, Arxcis completed a form worksheet and equipment survey report, then signed a "Certificate of Test/ Examination of Lifting Devices" ("Certificate"). The worksheets and Certificates indicate that Arxcis performed or oversaw the required load testing to certify Big Bob's 880,000-pound rated capacity. For instance, various inspection worksheets note that Arxcis performed a load test on July 28, 2014, to certify Big Bob's rated capacity. *See* Dkt. No. 145-1 at 66, 69. Despite the 2014 Certificate, however, Arxcis's Rule 30(b)(6) designee testified that the 2014 load test was invalid because it was completed with insufficient weight. *Id*. at 101–02. Similarly, Arxcis's documentation shows that it performed another load test on May 16, 2018, *see id*. at 71, but it is undisputed now that no such test occurred.

Additionally, Arxcis's representative testified that the only way Big Bob would have failed the inspection is "if we [Arxcis] felt that, you know, imminent failure is upon us, you know, if it's going to collapse the next lift kind of thing." *Id*. at 100–01. This is evidence from which a reasonable factfinder could conclude that Arxcis breached its legal duty to exercise reasonable care during its annual inspection and certification of Big Bob.

Turning to Kendrick, its inspector documented that Big Bob's hydraulic hoist pressure relief valve was safe even though the valve's PSI calibration exceeded the manufacturer's maximum limit. *Compare* Dkt. No. 135-7 at 17–18 (Kendrick inspection form) *with* Dkt. No. 135-8 at 7 (Remote Radio Controlled Boat Hoist, Operation and Maintenance Manual, "Testing the Hydraulic Pressure Settings").

1
2
3
4
5
6

Moreover, despite Dr. Hudson's conclusion that there would have been "excess wear and tear on the [Travelift's] hoist components," Kendrick documented no such wear or break down. *See* Dkt. No. 134-1 at 23; Dkt. No. 135-2 at 85 ("I believe [Kendrick's] inspection report just passed [the hoist chain] as green" in May 2019.). Based on these considerations, a reasonable factfinder could conclude that Kendrick did not act with reasonable care when it inspected Big Bob.

7
8
9
10
11

Plaintiffs also requested summary judgment in their favor on breach, but issues of material fact preclude it. The standard of care that applied to Arxcis and Kendrick during their inspections and the reasonableness of their actions are genuinely disputed. Accordingly, the Court cannot decide whether Arxcis or Kendrick breached their respective duties as a matter of law.

12
13
14
15
16
17
18
19
20
21

Finally, Arxcis and Kendrick each assert that they are entitled to summary judgment because Plaintiffs lack evidence of causation. The Court disagrees. A reasonable person could find that Arxcis's or Kendrick's alleged breach of duty contributed to or allowed for the continued and repeated overloading of Big Bob, which led to the Travelift's foreseeable failure. Hudson's testimony supports this conclusion, as does other evidence in the record, including the testimony of Kendrick's agent responsible for inspecting Big Bob and Big Bob's manual. *See* Dkt. Nos. 1134-1 at 17–18 (Hudson report quoting Remote Radio Controlled Boat Hoist, Operation and Maintenance Manual), 135-5 at 6–7 (Kendrick agent explaining that pressure relief valves protect the hydraulic system by limiting lift capacity).

22
23

In sum, with respect to Plaintiffs' negligence claims against Arxcis and Kendrick, no Party is entitled to summary judgment on the issues of breach and causation.

### 3.6.2    Issues of material fact preclude summary judgment on the issue of Delta's gross negligence.

Plaintiffs and Delta each request summary judgment in their favor on Plaintiffs' gross negligence claim against Delta. Beginning with Plaintiffs, they assert that Delta committed gross negligence when it knowingly overloaded Big Bob by using it to lift the more-than-880,000-pound TRITON. Plaintiffs argue that, as a result, the vessel repair contract's damages limitation clause of $300,000 is void. *See Royal Ins. Co. of Am.*, 194 F.3d at 1014–16 ("a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence"). Delta opposes the motion and filed a separate motion for summary judgment, requesting that the Court dismiss Plaintiffs' gross negligence claim against it or cap Plaintiffs' damages at $300,000 per the Parties' vessel repair contract.

First, the Court rejects Delta's argument that Plaintiffs can't prove causation for reasons stated above, such as Plaintiffs' expert testimony about causation. *See* Dkt. No. 134-1 at 11 ("Failure of Big Bob"). On the issues of duty and breach, the Court finds that issues of material fact disputed facts preclude summary judgment in either Parties' favor for the reasons below.

The Ninth Circuit has defined gross negligence in the context of the general maritime law as: "the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another; such a

1    gross want of care and regard for the rights of others as to justify the presumption

2    of willfulness and wantonness." *Shaw v. United States*, 436 F. Supp. 3d 1315, 1327

3    (N.D. Cal. 2020) (quoting *Royal Ins. Co. of Am.*, 194 F.3d at 1015 (9th Cir. 1999)

4    (internal citation and quotation omitted)). It has further explained that "gross

5    negligence is simply a point[] on a continuum of probability[,] and its presence

6    depends on the particular circumstances of each case." *Royal Ins. Co. of Am.*, 194

7    F.3d at 1015; *see also Ocampo v. United States*, Case No.: 15-cv-00180 JAH-WVG,

8    2018 WL 6687150, at *8 (S.D. Cal. Sept. 21, 2108). Because the presence of

9    negligence or gross negligence is so fact-dependent, courts rarely decide its

10    existence on summary judgment. *Christensen*, 279 F.3d at 813–14 ("Whether the

11    defendant acted reasonably is ordinarily a question for the trier of fact.").

12    Plaintiffs' evidence purportedly shows that Delta repeatedly overloaded the

13    Travelift in violation of the manufacturer's express warnings, and that Delta should

14    have known this would cause Big Bob to fail as it did. For example, "[t]he operating

15    manual for Big Bob explicitly warns: "*NEVER OVERLOAD A WIRE ROPE. This*

16    *means NEVER USE the wire rope where the load applied to it is greater than the*

17    *working load determined by Marine Travelift, Inc.*" Dkt. No. 134-1 at 17 (quoting

18    Remote Radio Controlled Boat Hoist, Operation and Maintenance Manual at 2–9).

19    Plaintiffs' expert Hudson opines, "[c]onsidering the documented lightship weight of

20    the [TRITON] exceeded the maximum capacity of Big Bob by as much as 13%, it is

21    clear that Big Bob was repeatedly overloaded." *Id*. According to Dr. Hudson,

22    "[r]epeatedly loading a crane [like Big Bob] in excess of its maximum capacity will

23    result in compounding degradation of the crane, including but not limited to

material fatigue, creep deformation, excess wear and tear on the hoist components, and excessive elongation of the wire ropes." *Id*.

In response, Delta produced evidence showing that it did not overload Big Bob as Plaintiffs claim, including evidence indicating that the TRITON weighed less than or close to 880,000 pounds. For example, Delta produced the lift plan for the TRITON, which shows a lightship weight of 837,603.72 pounds. Dkt. No. 81 at 3. Granted, the lift plan indicates that the TRITON's lightship weight was 880,188.20 pounds after applying a margin. *Id*. But even then, the Court cannot conclude that proceeding to lift the TRITON at 880,188.20 pounds constitutes gross negligence as a matter of law—especially considering that Delta also presented evidence showing that the TRITON was "effectively empty of fuel, water, and other items" like "tenders, anchors chain, and the like" during the lift. Dkt. 69 at ¶ 22. In the same vein, Delta presented evidence that the Big Bob had a functioning, "safe" alarm that would have sounded—but did not go off—if Big Bob had been overloaded on the day that Big Bob failed. Dkt. No. 69 at ¶ 33.

In sum, genuinely disputed issues of material fact preclude summary judgment on Plaintiffs' gross negligence claim against Delta. Consequently, the Court must make factual findings during the upcoming bench trial to decide whether the vessel repair contract's damages limitation clause is void.

### 4. CONCLUSION

Given the reasoning above, the Court ORDERS:

- Plaintiffs' Motion for Summary Judgment re Vessel Repair Contract and Spoliation of Evidence, Dkt. No. 55, is GRANTED IN PART.

1
2
3
4
5
6

Partial summary judgment is denied, but the Court finds that Delta spoliated evidence and that sanctions are appropriate. Accordingly, the Court will apply an adverse inference regarding the wire rope and the condition of the engine when it assumes its factfinding role in this bench trial. The Court will fashion the language and scope of the inference at a later date, with input from the Parties.

7
8
9
10
11

- Plaintiffs' Motion for Partial Summary Judgment Against Arxcis and Kendrick Defendants, Dkt. No. 58, is GRANTED IN PART. The Court finds Kendrick and Arxcis owed Plaintiffs a duty of reasonable care in the performance of their inspections and maintenance of the Marine Travelift Crane (a/k/a Big Bob).

12
13
14
15

- Delta's Motion to Strike, contained in its response to Plaintiffs' Motion for Summary Judgment Re Vessel Repair Contract and Spoliation of Evidence, Dkt. No. 66, is DENIED AS MOOT, as the Court denied partial summary judgment in Plaintiffs' favor.

16
17
18

- Delta's Motion to Supplement the Record, Dkt. No. 96, is DENIED AS MOOT, as the Court denied partial summary judgment in Plaintiffs' favor.

19

- Delta's Motion for Summary Judgment, Dkt. No. 105, is DENIED.

20

- Kendrick's Motion for Summary Judgment, Dkt. No. 115, is DENIED.

21
22

- Plaintiffs Motion to Exclude pursuant to Fed. R. Civ. P. 37(c), Dkt. No. 120, is GRANTED IN PART.

23

- o The Court excludes the expert testimony of Robert Basile, Andrew Marchesseault, and Grant Quiller under Rule 37(c).

- o Dr. Brian Flinn may testify at trial within the scope of his deposition any portions of the joint expert report and rebuttal report attributed to him.

- Arxcis's Motion for Summary Judgment, Dkt. No. 126, is DENIED.

- Delta's Motion to Exclude under Fed. R. Evid. 702, Dkt. No. 131, is GRANTED IN PART. The Court excludes expert testimony on environmental regulations, including the Clean Water Act.

Dated this 31st day of January, 2025.

Jamal N. Whitehead
United States District Judge